NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0564n.06

No. 09-4524

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Aug 11, 2011*

LEONARD GREEN, Clerk

CHRISTINE A. MONATERI,

      Plaintiff-Appellant,

v.

COMMISSIONER OF SOCIAL SECURITY,

      Defendant-Appellee.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO

_____/

BEFORE:    BATCHELDER, Chief Judge; CLAY and SUTTON, Circuit Judges.

      **CLAY, Circuit Judge.**  Plaintiff Christine Monateri appeals an order affirming the Social

Security Commissioner's decision denying her application for social security disability and

supplemental security income benefits.

      For the reasons set forth herein, we **AFFIRM** the district court's decision.

**FACTUAL BACKGROUND**

**I.     Medical and Employment History**

      At the time that she filed applications for Social Security Disability ("SSD") and Social

Security Income ("SSI"), Claimant Christine Monateri was a 47-year old woman, who had a history

of semi-skilled sedentary work and was a high school graduate with one year of college and a

certificate in accounting. Prior to her disability onset date, Monateri worked steadily as a secretary, an accounts receivable clerk and a collections clerk.

In February 1999, Monateri had what she describes as a "breakdown" and was hospitalized. After her release, she returned to work at her then-employer Morrison Products, where she remained until November 1999, when she had a second breakdown. At that time, she was terminated from her job at Morrison.

In February 2000, Monateri began mental health treatment at Pathways Mental Health Center in Mentor, Ohio. She was initially assessed by psychiatrist Dr. Farid Sabet, whose notes document his impression that Monateri suffered from panic disorder and dysthymia (chronic low-grade depression). It appears from the record that Monateri was already taking Xanax (alprazolam), an anti-anxiety agent, and Prozac (fluoxetine), an anti-depression medication, when she saw Dr. Sabet. He maintained her on the Prozac, but switched her from Xanax to Klonopin (clonazepam). A month later, on March 3, 2000, Monateri's prescription for Prozac was replaced with one for Paxil (paroxetine), a selective serotonin reuptake inhibitor (SSRI).

In June 2000, Dr. Kurt Bertschinger, also a psychiatrist at Pathways, began to treat Monateri for her mental disorders. At that time, Dr. Bertschinger completed a "Mental Functional Capacity Assessment" on Monateri, wherein he found her "moderately limited" in 16 of 20 listed work-related areas. He also offered an assessment that she was "unemployable" and that her limitations were expected to last between nine and eleven months.

It appears that Monateri's condition worsened over the next several months, and by August 2000, Dr. Bertschinger noted the presence of major depressive disorder and generalized anxiety

disorder. Dr. Bertschinger noted that Monateri's condition was improved by the medication, but that her "major life stressors" were continuing. Dr. Bertschinger continued to treat Monateri throughout January 2001, during which time he made several adjustments to her medication.

In July 2001, Monateri had a "psychological consultive examination" with Pathway's Dr. Kenneth Felker.[1] Dr. Felker diagnosed Monateri with depressive disorder, polysubstance abuse (in remission), and panic disorder without agoraphobia. He concluded that Monateri was impaired in her ability to concentrate, carry out tasks, and relate to others. He also opined that her ability to relate to work peers and supervisors and to tolerate the stress associated with employment was "mildly to moderately" impaired.

The condition of Monateri's mental health, and the severity of her symptoms, fluctuated throughout 2001. At times, Monateri is noted as having decreased tearfulness, brighter affect, and decreased symptoms of depression, anxiety and panic; at other times, she is noted as "doing okay but not great," suffering from "periods of depression," and experiencing "hypomanic episodes;" and her response to treatment is noted as ranging from "partial" to "fair."

The record is silent on Monateri's medical treatment between December 2001 and February 2003, when Pathway's psychiatrist Dr. Thomas Svete took over Monateri's care.[2] Dr. Svete's impression was that Monateri suffered from panic disorder and agoraphobia, and post-traumatic stress disorder and alcohol dependence "by history." Monateri's condition appears to have worsened

---

[1]Dr. Felker appears to be a psychologist, but the record is unclear.

[2]Though Monateri has supplied no medical records for the period between December 2001 and February 2003, it is clear that she was seen by at least one other physician in this intervening time frame, a Dr. Immerman.

throughout 2003, with Dr. Svete noting that she was "not doing well" and was "severely impaired." Dr. Svete rated her level of impairment as ranging from a 5 to a 7 (on a scale of 10).

Dr. Svete completed an "Assessment of Ability to Do Work-Related Activities (Mental)" created by Monateri's attorney on June 11, 2003.[3] On this form, Dr. Svete indicated that Monateri showed "marked impairment" in her ability to: conduct daily activities; maintain concentration and attention for extended periods; sustain a routine without special supervision; perform activities within a schedule, maintain regular attendance, and be punctual; respond appropriately to co-workers; respond to customary work pressures; and respond appropriately to changes in the work setting. He indicated lesser, but still present, limitations in several other categories, including Monateri's ability to: relate to people; maintain personal habits; understand, carry out, and remember instructions; respond to supervision; use good judgment; perform complex, repetitive, or varied tasks; and behave in an emotionally stable manner. Dr. Svete further opined that Monateri's condition would be exacerbated by a stressful work environment, and that she might be absent from work as many as three days per week.

On January 7, 2004, Dr. Svete reported that Monateri informed him that she was abusing opiates, and requested admission to a drug detoxification program. On January 10, 2004, Monateri was admitted to Rosary Hall at St. Vincent Charity Hospital for medically supervised opiate and benzodiazepine withdrawal. In addition to abusing her prescribed Xanax, Monateri admitted to abusing Oxycontin, a controlled opiate. Monateri was admitted to Huron Hospital a week later after

---

[3]Dr. Svete reconfirmed this assessment on October 8, 2006.

her discharge from Rosary Hall, for symptoms related to her mental disorders and because she had relapsed on Xanax.

Dr. Svete continued to treat Monateri throughout early 2004 and by May, when Monateri continued to show improvement, had decreased all of her medications. At that time, he reported that Monateri was "doing extremely well," attending alcoholics anonymous ("AA") meetings, and had been drug (abuse) free for 60 days. He opined that her conditions were "in early remission" with the exception of her anxiety. By June of 2004, Dr. Svete's assessment was that Monateri was "mildly ill."

In August of 2004, Monateri was again admitted to Rosary Hall for drug detox, after relapsing on Oxycontin.[4]

In September 2004, Monateri began working full-time as an accounts receivable/collections clerk at Cintas Corporation. On January 26, 2005, Monateri reported to Dr. Svete that the pressure of the job was causing a recurrence of her mental health symptoms. She reported increased anxiety, and also admitted that she had begun abusing Oxycontin again. In addition to his normal treatment, Dr. Svete suggested at this time that Monateri enter therapy and take only prescribed medications.

On March 13, 2005, Monateri was admitted to Laurelwood Hospital for polysubstance detox and symptoms of affective disorder. Hospital records report that Monateri was abusing Oxycontin and Vicodin, in addition to taking her prescribed medications: Zyprexa, Trazodone, and Neurontin.

---

[4]On each occasion that Monateri was admitted to drug detox, she was also treated for her mental disorders.

Monateri remained at Laurelwood until March 23, 2005. At that time, she was informed by Cintas that she had been terminated from her position.

By April 2005, Monateri had begun therapy and was regularly attending AA meetings. Dr. Svete reported that Monateri was addressing her "dishonesty/manipulation regarding drug abuse" in therapy. He referred her for additional treatment to Neighboring Clinical Services Dual Diagnosis Team, which specializes in treating patients with both mental health and substance abuse disorders. Katherine Proehl, Monateri's treating clinician at Neighboring,[5] diagnosed Monateri with drug dependence in partial remission and anxiety disorder. Proehl also noted that Monateri's external stressors were severe and that she was "moderately" mentally ill.

In July 2005, Monateri was again admitted to Laurelwood Hospital for drug detox. Monateri admitted that she "just started using pain pills again, [though she] knew it was wrong." On August 8, 2005, Laurelwood discharged her, conditioned on "completion of her detoxification and developing motivation addressing her chemical dependency." On October 4, 2005, Monateri reported to Dr. Svete that she had begun abusing codeine-based cough syrup given to her by a friend. A month later, she reported that she had begun to use Percocet, also provided by a friend.

Monateri's mental health condition continued to vacillate throughout late 2005 and early 2006. At all times she showed symptoms of anxiety and depression, which were exacerbated by the pressure that she reported feeling due to her employment search.

In April and May 2006, Proehl noted that Monateri had started taking a computer class at school, but that she was also still abusing Xanax and other medications from friends. Monateri

---

[5]Katherine Proehl is a doctor of nursing.

reported that she liked school and that she was fine during the mornings, but felt increased anxiety in the afternoons. In June and July, Proehl reported that Monateri was "job hunting" and that she was doing well "with structure and cognitive interactions." In December, Proehl reported that Monateri had worked for 3 days at a temporary employment agency, and that Monateri admitted to continuing to abuse a friend's Percocet.

In Monateri's last medical report, dated March 1, 2007, Proehl diagnosed Monateri as suffering from generalized anxiety disorder and drug abuse. At that meeting, Monateri informed Proehl that she had been Xanax-free for one month, but that she was still abusing Percocet.

During the period of her disability, Monateri has resided with her mother, one of her two adult children, her brother or various friends. At her hearing before the ALJ, Monateri testified that since the onset of her disability she has had very little social interaction, interest in few hobbies, an inability to sustain interest in activities or mental concentration, and marked anxiety in everyday social interactions. Monateri also conceded during testimony that she did not admit her drug abuse to Dr. Svete or anyone at Pathways until January 2004, although it began sometime before March 1, 2002.[6] (R. 544-46: Ex. 22F.)

## II.    Procedural History

Monateri filed applications for Social Security Disability and Supplemental Security Income on May 8, 2001, stating a disability onset date of November 21, 1999. Because Monateri had

_____

[6]The record indicates that Monateri was abusing non-prescribed drugs as early as June 22, 2000, when a progress note by one of her physicians records that she has been taking a friend's Prozac. (App. 170.)

previously filed applications for SSD and SSI that were denied for the same time period, the

Commissioner set the disability onset date for the new application at November 1, 2000.[7]

Monateri's benefits were initially denied and she filed an application for reconsideration.

The Administrative Law Judge ("ALJ") denied the claim on reconsideration on January 2, 2002.

Monateri filed a request for a hearing, which was held on July 15, 2003. On November 19, 2003,

Monateri's claim was again denied. Monateri requested review, which was denied on January 26,

2005.

Monateri filed a claim in district court, and on November 1, 2005 the parties stipulated to

remanding the case to the ALJ for further proceedings. After considering additional evidence

presented at a second hearing, the ALJ again denied the claim on May 25, 2007. In reaching its

determination, the ALJ made the following findings:

1.  The claimant has performed some work during the relevant period;
2.  The claimant's severe impairments are polysubstance dependance/abuse, depressive disorder, panic disorder, and post-traumatic stress disorder. The claimant does not demonstrate any physical impairments.
3.  The claimant's substance addiction disorder meets the listed criteria, but independent of considerations of substance abuse, the claimant does not have a disability or combination thereof that meet or exceed the listed criteria;
4.  The claimant is unable to perform any past relevant work; and
5.  Considering all relevant criteria, there are jobs that exist in significant number in the economy that claimant is able to perform.

(App. 314-23: ALJ Op. 1-10.)

On May 28, 2008, Monateri filed the instant complaint in the district court. On September

11, 2009, the district court issued an opinion affirming the decision of the ALJ. Monateri filed a

---

[7]Monateri's first application was filed on July 11, 2000, and was denied on October 31, 2000. Monateri did not appeal the denial.

motion to amend the judgment due to errors of law. The district court denied the motion on October 19, 2009. Monateri then filed this timely appeal.

On appeal, Monateri alleges that the Commissioner's decision is unsupported by substantial evidence because the Commissioner: 1) failed to consider the medical opinion of one of her physicians, Dr. Bertschinger; 2) did not give controlling weight to the medical opinion of a treating physician, Dr. Svete; 3) improperly made an adverse credibility finding against her; and 4) relied on improper testimony from the vocational expert. Monateri also claims that the district court erred in denying her motion to amend its opinion.

## ANALYSIS

### I.      Standard of Review

We review the district court's social security determination *de novo*. *Valley v. Comm'r of Soc. Sec.*, 427 F.3d 388, 390 (6th Cir. 2005). The Commissioner's decision must be affirmed unless its factual determinations are unsupported by substantial evidence, or the decision was arrived at with reference to improper legal standards. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). We have interpreted "substantial evidence" to mean "more than a scintilla of evidence but less than a preponderance; and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brainard v. Sec. of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

"Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."

*Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## II.     Social Security Framework

The Commissioner determines the merit of a social security disability claim by following a sequential five-step analysis. *See* 20 C.F.R. § 404.1520. The Commissioner must determine: (1) whether the claimant is working; (2) whether the alleged impairment is severe; (3) whether the impairment meets or equals a listed impairment; (4) whether the claimant can still do past relevant work; and, (5) when considering the claimant's age, education, work experience, and residual functional capacity, whether the claimant can do other work. 20 C.F.R. § 404.1520(a)(4). The claimant has the burden of satisfying the first four steps. *See Longworth v. Comm'r Soc. Sec. Admin.*, 402 F.3d 591, 595 (6th Cir. 2005). The burden then shifts to the Commissioner to answer the final inquiry. *Id*.

The Commissioner is required to "evaluate every medical opinion" that is presented in the record. 20 C.F.R. § 404.1527(d). Furthermore, the Commissioner is bound by the "treating physician rule," which "requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009). The opinion of a treating physician must be given deference unless it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or it is "inconsistent with the other substantial evidence in [the] case record." *Wilson*, 378 F.3d at 544. This rule is embodied in the Social Security Regulations at 20 C.F.R. § 404.1527(d)(2), which states:

Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

If the Commissioner determines that it will not give controlling weight to the opinion of a treating physician, it must provide "good reasons" for its decision. 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). "[A] failure to follow the procedural requirement of identifying the reasons for discounting [a treating physician's] opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Lastly, for the purposes of Social Security, "[a]n individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C.A. § 423(d)(2)(C). "The key factor [the Commissioner] will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether [the Commissioner] would still find [the claimant] disabled if [the claimant] stopped using drugs or alcohol." 20 C.F.R. § 404.1535(b)(1). Monateri argues that if the Commissioner is unable to separate the substance abuse from the claimant's otherwise established disabilities, the Commissioner must find that the substance abuse is not material. *See* Soc. Sec. Admin. Emergency Teletype, No. EM-96-94 (Aug.

30, 1996). We can assume this is true, because substantial evidence supports the Commissioner's decision that Monateri's substance abuse can be separated from her disabilities.

### III. Application to Facts

Monateri's case presents a peculiar question in the context of the social security framework. At the third step of the requisite analysis, the ALJ found that Monateri's "substance addiction disorder meets the listed criteria, but independent of considerations of substance abuse, the claimant does not have a disability or combination thereof that meet or exceed the listed criteria." Therefore, we must not only review whether the ALJ's determination that Monateri's mental impairments do not meet or exceed the criteria is supported by substantial evidence, we must also address the materiality of her substance abuse.

### A. The Commissioner's Opinion

In denying Monateri's claim, the ALJ found, at step one of the sequential five-step social security analysis, that Monateri had engaged in substantial gainful activity within the period of her disability, from autumn of 2005 through the spring of 2006, when she was employed full-time at Cintas. The ALJ further concluded that Monateri had not engaged in such activity before or after her time with Cintas. (App. 314-23: ALJ Op. at 4.)

At the second step, the ALJ determined that Monateri had no physical impairments, but that she had the following severe mental impairments: polysubstance abuse/dependance, depressive disorder, panic disorder, and post-traumatic stress disorder. (*Id*.) The ALJ based this conclusion on the medical records in evidence, including the records supplied by Dr. Svete and Katherine Proehl.

At the third step, the ALJ found that while Monateri's mental impairments met or exceeded the listed impairments when her substance abuse addition was included, they did not when substance abuse was excluded. (*Id*. at 5.) The ALJ summarized Monateri's history of substance abuse, including her several admissions to drug detox facilities. The ALJ also noted Monateri's testimony that from 1990 to 1999, her longest drug and alcohol-free period, she was "depression free and was feeling very good." The ALJ then reviewed the medical evidence provided by Dr. Svete, who was identified as Monateri's treating physician. While the ALJ credited Dr. Svete's assessment of Monateri's functional capacity, he only did so "with the inclusion of the factor of substance abuse." (*Id.*) The ALJ so limited the weight given to Dr. Svete's opinion because Dr. Svete "was not aware of [Monateri's] return to substance abuse until January 2004, which means that he did not have an accurate picture of [Monateri's] level of functioning." (*Id*. at 8.)

In considering the materiality of Monateri's substance abuse, the ALJ additionally adopted the opinion of the medical expert, psychiatrist Dr. Gottfried Spring. Dr. Spring opined that, with the inclusion of the drug abuse, Monateri exhibited "moderate" or "marked" limitations in activities of daily living, maintaining social function, and sustaining concentration; excluding the drug abuse, Dr. Spring opined that Monateri showed "mild" to "moderate" limtations in these categories. He also opined that she would have repeated episodes of decompensation (i.e., functional deterioration) when abusing substances, but would only be expected to have one or two such episodes absent the abuse. (*Id.* at 6.) Dr. Spring testified that he reached his conclusions after reviewing all of Monateri's medical evidence.

13

The ALJ read Dr. Svete's 2003 opinion, in which he opined that Monateri was unemployable, alongside that of Dr. Spring, who testified that Monateri's "abuse of prescription medications would exacerbate symptoms of anxiety and depression." (*Id.* at 8.) The ALJ also took into consideration Proehl's opinions, notes and statements regarding Monateri's improved condition during recent periods of sobriety. After doing so, the ALJ determined that Dr. Svete's opinion of Monateri's condition was "not supported by sufficient corroborative medical evidence independent of considerations of substance abuse" and therefore "not entitled to either controlling weight or special deference." (*Id.*)

In reaching its conclusion, the ALJ further reviewed Monateri's medical records, noting that Monateri is reported as doing "okay" and "regaining stability" in 2001, but that her condition worsened in 2001, when she "resumed substance abuse after a long period of sobriety." (*Id.* at 7.) The ALJ also noted that Monateri's "depressive symptoms . . . increased" after she "started using again," resulting in "the need for inpatient treatment." (*Id.*) Monateri's medical records from Proehl also show that when she again lessened her drug abuse in 2006, she began functioning better.

The ALJ also reviewed Monateri's daily activities, including her testimony regarding her ability to do everyday household activities, engage in leisure activities— such as "read[ing] books, watch[ing] DVDs, and glanc[ing] through newspapers." The ALJ considered Monateri's testimony that "she has problems with concentration and has to re-read things," "that she does not feel she could sustain any employment, and that she suffers from severe anxiety and 'peaks and valleys' of depression." (*Id.*)

The ALJ noted that while Monateri has "had a number of admissions and crises related to the need for detox and substance abuse . . . [her] impairments have not otherwise required acute inpatient or outpatient emergency care and treatment during the period under review. . . . ." (*Id.*) Monateri's most recent treatment notes, the ALJ stated, also supported the conclusion that "[w]hen [Monateri] is not abusing medication . . . the record shows a higher level of functioning compatible with work activity, (*id.* at 8), and that she "was previously capable of working without abusing substances." (*Id.*)

In consideration of the aforementioned, the ALJ concluded that "[e]vidence in the record regarding [Monateri's] daily activities independent of substance abuse is consistent with a residual functional capacity for work." (*Id.* at 7)

The ALJ then continued to the fourth step of the social security inquiry, where he determined that Monateri was incapable of performing her past relevant work. (*Id.* at 9.) After hearing testimony from a vocational expert, the ALJ determined that there are a significant number of jobs in the economy that can be performed with Monateri's residual functioning capacity ("RFC") "simple, routine work." (*Id.*) Consequently, the ALJ denied Monateri's claim, based on the conclusion that Monateri "has not been under a 'disability' as defined in the Social Security Act, at any time through the date of th[e] decision, independent of considerations of substance abuse." (*Id.* at 10.)

### B.    Substantial Evidence Supporting the Determination

We find that the ALJ's determination was supported by sufficient evidence, as Monateri's substance abuse was a contributing factor to her mental impairments; the ALJ did not violate the

15

treating physician rule by omitting the opinion of Dr. Bertschinger; the ALJ provided "good reasons" why it did not give controlling weight to the opinion of treating physician Dr. Svete; the ALJ's partial adverse credibility finding against Monateri was supported by record evidence; and the ALJ did not err, as a matter of law, in accepting the testimony of the vocational expert.

### 1.     Mental Impairments and Drug Dependency

Upon review, we find that the ALJ's determination was supported by substantial evidence, as the record supports the conclusion that Monateri's substance abuse materially contributed to her mental impairments.

Monateri does not dispute the ALJ's conclusion that her impairments, with the inclusion of the factor of substance abuse, equal or exceed an impairment listed in the Social Security Regulations. She instead argues that her substance abuse is immaterial, and that her impairments are sufficiently severe to qualify for disability, absent consideration of her drug use.

Under the Social Security Regulations, "[t]he key factor [the Commissioner] will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether [the Commissioner] would still find [the claimant] disabled if [the claimant] stopped using drugs or alcohol." 20 C.F.R. § 404.1535(b)(1). The ALJ is further instructed to "evaluate which of [the claimant's] current physical and mental limitations. . . would remain if [the claimant] stopped using drugs or alcohol and then determine whether any or all of [the claimant's] remaining limitations would be disabling." 20 CFR § 416.935(b)(2).

In practice, we have allowed an ALJ to look at a claimant's periods of sobriety and compare those periods to times when the claimant was abusing substances, in order to make this evaluation.

*See, e.g., Bartley v. Barnhart*, 117 F. App'x. 993, 998 (6th Cir. 2004) (approving of the ALJ's approach of "look[ing] to periods of sobriety in the record to determine whether [the claimant] suffers from a work-limiting mental illness independent of substance abuse").

This is exactly what the ALJ did in this case. The ALJ considered Monateri's mental condition prior to 1999, when she admittedly was not abusing either alcohol or drugs. He also looked at the period between August 2005 and May 2005, when Monateri was working full-time and in remission from drug abuse. Finally, the ALJ evaluated Monateri's condition in 2006, when Proehl reported that she was in partial remission, and determined that her mental impairments had improved, which is supported by the fact that she began taking computer classes and did some work through a temporary agency.

Contrary to Monateri's assertion, this is not an instance where the ALJ lacked evidence sufficient to separate the substance abuse from the mental illness. Because Monateri had periods of both sobriety and partial remission, and the medical records reflected her improvement during such periods, the ALJ was able to compare those times to others when Monateri was in addiction. In doing so, the ALJ determined that Monateri's drug abuse exacerbated her mental impairments, and that absent this effect on her condition, the depth of her depression, anxiety and panic disorders would not prevent her from working.

**2.    Omission of Medical Opinions of Dr. Bertschinger**

Monateri argues that the ALJ's opinion is not supported by substantial evidence because it failed "to discuss Dr. Bertschinger's opinion at all," and that this "failure to so much as discuss Dr. Bertschinger's findings constitutes reversible error," as he should be considered a treating physician.

17

In affirming the ALJ's determination, the district court held that the ALJ's failure to mention Dr. Bertschinger's opinion, while error, was *de minimis* and as such did not require reversal. (Dist. Ct. Op. at 5.) In doing so, the district court also distinguished between "medical notes" and "medical opinions," finding that the records supplied by Dr. Bertschinger constituted only medical notes and as such did not require deference. (*Id.* at 6.)

We reach the same outcome as the district court, but on different grounds. In this Court's decision in *Rogers*, we held that a failure to follow the procedural requirement of giving "good reasons" for discounting a treating physician's opinion constituted a lack of substantial evidence. *Rogers*, 486 F.3d at 242. We held that an ALJ's failure to set forth reasons for according weight to the medical opinion of a treating physician justified reversal and remand because it precluded meaningful appellate review of the determination. *See id.* at 242–43. Therefore, the complete omission of a treating physician's opinion in an ALJ's decision would generally constitute a lack of substantial evidence and compel remand. We have not yet held that such an error is subject to a harmless error exception and it is not necessary to do so today.

Instead, assuming that Dr. Bertschinger was indeed a treating physician, we find that the ALJ's failure to specifically mention Dr. Bertschinger by name does not constitute a lack of substantial evidence, because Dr. Bertschinger's medical records and opinions were explicitly incorporated into the medical opinion given by Dr. Svete, and were considered by the ALJ.

After being seen by Dr. Bertschinger at Pathways, Monateri was treated by several other physicians, including Dr. Felker and Dr. Immerman. Her final treating physician at Pathways was Dr. Svete. In providing his medical opinion, Dr. Svete asserted that he reached all conclusions

regarding Monateri's medical condition based both on his personal medical observations and on his review of Monateri's *entire medical record* from Pathways. In a letter dated July 11, 2003, Dr. Svete stated that he had "reviewed [Monateri's] past medical records and [had] incorporated the clinical findings and history as set forth by [his] professional colleagues." (R. 226: Ex. 14F)

At her hearing before the ALJ, Monateri acknowledged that it was her intent that Dr. Svete's opinion convey the medical determination of all of her physicians at Pathways, and argued that though she had been seen by "four psychologists at . . . Pathways," Dr. Svete's medical opinions should be given controlling weight because he "had the benefit of [Monateri's] entire record there at Pathways since she was first seen in February of 2000." (R. 261: Hearing Tr. at 15.)

Because Dr. Svete incorporated Dr. Bertchinger's notes and opinions, and because Monateri asked that the ALJ treat Dr. Svete's opinion as incorporating her entire medical record from Pathways, the ALJ's failure to mention Dr. Bertschinger by name, under these circumstances, does not constitute a lack of substantial evidence.

**3.    Deference to the Medical Opinions of Dr. Svete**

Monateri next argues that the ALJ erred in "declin[ing] to give controlling weight to the opinion of . . . Dr. Svete." She further contends that the ALJ "misconstrued temporary periods of improvement . . . as indicative that Monateri was functional when not using drugs," instead of interpreting such periods as acceptable variations in the level of her functioning. In making its determination, the ALJ credited the opinion of Dr. Svete, "but only with the inclusion of the factor of substance abuse."

Monateri acknowledges that at the time that Dr. Svete completed his initial assessment of her condition in 2003, he was completely unaware of her drug abuse and so was incapable of assessing the extent of her impairments absent such abuse.[8] In 2006, when Dr. Svete reaffirmed his assessment of Monateri, she was still struggling with drug abuse, as evidenced by her multiple admissions to detox facilities. In his one-paragraph reaffirmation, Dr. Svete nowhere indicated that his medical conclusions, as of 2006, were made exclusive of Monateri's drug abuse. Notably, there is also no indication in the record that Monateri was ever drug-free (for more than a nominal period of time) between 2001 and 2006, which means that Dr. Svete never had the opportunity to assess her condition when she was completely free from substance dependance.

The ALJ properly considered testimony from the medical examiner, Dr. Spring, who not only reviewed Monateri's medical records from Pathways, but also those from Laurelwood, Huron, Rosary Hall, and Neighboring, some of which document Monateri's mental condition during her periods of remission from drug abuse. Because Dr. Svete could provide no insight into Monateri's condition when sober, the ALJ properly supplemented Dr. Svete's medical opinions with those of Dr. Spring.

In reaching its determination regarding whether Monateri suffered from severe impairments independent of her drug dependency, the ALJ provided a good reason why it did not fully defer to

---

[8]Monateri argues that "instructive language prefacing Dr. Svete's opinion," in which she requested that Dr. Svete confine his opinion to her "performance when not under the influence of drugs or alcohol," is sufficient to demonstrate that Dr. Svete's assessment accurately reflects Monateri's drug-free condition. (Reply at 15.) But this is insensible. If Dr. Svete did not know that Monateri was abusing drugs, then he could not exclude the effects of those drugs when considering Monateri's symptoms.

the medical opinion of Dr. Svete, to wit, his unawareness of her drug abuse; and it reasonably weighed the opinion of Dr. Spring, which took into account both periods of drug abuse and periods of sobriety.

### 4. Adverse Credibility Finding

Monateri claims that the ALJ's finding that her "statements concerning the intensity, duration and limiting effects of [her] symptoms are not entirely credible" is not supported by substantial evidence. Monateri contends that the ALJ erroneously based this conclusion on the belief "that Monateri was only ever hospitalized because of drug use."

On the contrary, the ALJ justified its partial adverse credibility finding on several factors, including the accurate conclusion that Monateri's impairments have—excluding occasions also involving substance abuse detox—"not otherwise required acute inpatient or outpatient emergency care and treatment." In addition, the ALJ considered Monateri's daily activities, including housework, meal preparation and reading; her social interactions, including those with her family and a boyfriend that she had between 2002 and 2005; and the observations of treating physicians as embodied in her medical records.

The ALJ also considered Monateri's condition during periods of sobriety, when the medical records indicate that she showed improvement in her functioning levels and the ability to engage in gainful employment. The contrast between Monateri's periods of sobriety and periods of substance abuse is emphasized by her success from 1990 to 1999; her employment in 2004-2005; and her ability to take classes when she went into partial remission again in 2006.

21

This evidence is sufficiently substantial to justify the ALJ's credibility finding. *See Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001) (adverse credibility finding will be set aside only for "compelling reason").

### 5. Reliance on Vocational Expert Testimony

Monateri's final argument is that, based on the ALJ's determination that Monateri's RFC was limited to simple work, the Vocational Expert ("VE") should have been instructed to present only "the availability of jobs in the national economy which have a reasoning level of '1,' as defined in the Dictionary of Occupational Titles (DOT)." As the Commissioner accurately points out, "Monateri cites no authority for the proposition that jobs requiring reasoning levels two or three are inconsistent as a matter of law with a limitation to simple work."

While the Commissioner "will take administrative notice of reliable job information available from . . . [the] Dictionary of Occupational Titles," 20 C.F.R. § 404.1566(d), "the Social Security regulations do not obligate [the ALJ and consulting vocational experts] to rely on the Dictionary's classifications." *Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003) (citing *Conn v. Sec. of Health and Human Servs.*, 51 F.3d 607, 609 (6th Cir. 1995)). Because neither the Commissioner nor the VE has an obligation to employ the DOT, and there is no precedent that requires the Commissioner to align DOT "reasoning levels" with RFC classifications, Monateri's argument is without merit.

### IV. Motion to Alter or Amend Opinion

Because we find the ALJ's opinion to be supported by substantial evidence, we also conclude that the ALJ did not err when it declined Monateri's motion to alter or amend its opinion.

**CONCLUSION**

The ALJ's determination that, absent substance abuse, claimant was not disabled under the Social Security Regulations is supported by substantial evidence. We therefore hereby **AFFIRM** the decision of the district court.