**Ava STROLE, Plaintiff,**

v.

**COMMISSIONER OF SOCIAL SECURITY, Defendant.**

**Case No. 1:13–cv–929.**

United States District Court, S.D. Ohio, Western Division.

Signed Oct. 7, 2014.

---

Michael J. Mooney, Cincinnati, OH, for Plaintiff.

Adam R. Sorkin, Javitt Adili, Social Security Administration, Office of General Counsel, Allen Duarte, Office of the Chief General Counsel for SSA, Chicago, IL, John J. Stark, US Attorney Office, Columbus, OH, for Defendant.

**ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE, AND IS REVERSED; (2) JUDGMENT IS ENTERED IN FAVOR OF PLAINTIFF AWARDING BENEFITS; AND (3) THIS CASE IS CLOSED**

TIMOTHY S. BLACK, District Judge.

This is a Social Security disability benefits appeal. At issue is whether the ad-

ministrative law judge ("ALJ") erred in finding the Plaintiff "not disabled" and therefore unentitled to disability insurance benefits ("DIB"). (*See* Administrative Transcript ("Tr.") (Tr. 16–39) (ALJ's decision)).

## I.

On June 24, 2010, Plaintiff filed an application for DIB alleging disability since June 10, 2009. (Tr. 16). Plaintiff alleges disability due to degenerative disc disease of the lumbar spine, osteoarthritis in both hands with right thumb and left thumb conditions, obesity, vocal cord infection, and a history of hernia surgeries. (Tr. 24). Her applications were denied initially and upon reconsideration. (Tr. 16). A hearing was held before an ALJ on June 6, 2012. (*Id.*) Plaintiff appeared with her attorney, and Plaintiff, a medical expert, and a vocational expert testified. (*Id.*) The ALJ denied the claim on August 27, 2012, finding both that Plaintiff could return to her past work and that there are a significant number of other jobs in the national economy that she could perform. (Tr. 36–38).

Plaintiff requested a review of the ALJ's decision. (Tr. 6–11). The Appeals Council denied review on November 12, 2012. (Tr. 1–4). Plaintiff then commenced this action in federal court pursuant to 42 U.S.C. Section 405(g) for review of the Commissioner's final decision.

At the time of Plaintiff's alleged onset date, she was 47 years old and was considered to be a "younger person" for Social Security purposes. *See* 20 C.F.R. §§ 404.1563(c); 416.963(c). On March 6, 2012, Plaintiff turned 50 and became a person "closely approaching advanced age." *See* 20 C.F.R. § 404.1563(d). Plain-

tiff has a twelfth grade education. (Tr. 19). Plaintiff's past relevant work included work as a teacher's aide, group worker, job coach, case worker, and hospital administration clerk. (Tr. 36–37).[1]

The ALJ's "Findings," which represent the rationale of her decision, were as follows:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2010.

2. The claimant's date last insured as a Medicare Qualified Government Employee is on June 30, 2014.

3. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 10, 2009 through her date last insured of December 31, 2010 (20 CFR 404.1571 *et seq.*) or through the date of this decision.

4. Through the date of this decision, the claimant had the following severe impairments: history of vocal cord infection/vocal loss, history of obesity with gastric bypass surgery, history of hernia surgeries, osteoarthritis of hands and bilaterally with history of right thumb surgery and left thumb surgery and injury, and history of degenerative disc disease with fusion (20 CFR 404.1520(c)).

5. Through the date of this decision, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20

---

1. Past relevant work is defined in 20 C.F.R. § 404.1565(a) as work "done in the past 15 years, lasted long enough for you to learn to do it, and was substantial gainful activity."

This is important because an individual's past work is indicative of work the individual can be expected to do. *Id.*

CFR 404.1520(d), 404.1525 and 404.1526).

6. After careful consideration of the entire record, the undersigned finds that, through the date of this decision, the claimant has had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) with appropriate restrictions. Specifically, the claimant can lift/carry 50 occasionally 25 pounds frequently. She is able to sit for a total of 6 hours in an 8–hour workday. The claimant can stand for a total of 6 hours in an 8–hour workday.

7. Through the date of this decision, the claimant was capable of performing her past relevant work as a teacher's aide, group worker, job coach, case worker, and hospital administration clerk. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

8. The claimant was born on March 6, 1962 and was 48 years old, which is defined as a younger individual age 18–49, on the date last insured (20 CFR 404.1563).

9. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

10. Transferability of job skill is not material to the determination of disability because using the Medical–Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82–41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there were other jobs that existed in significant numbers in the national economy that the claimant also could have performed (20 CFR 404.1569 and 404.1569(a)).

12. The claimant was not under a disability, as defined in the Social Security Act, at any time from June 10, 2009, the alleged onset date, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 18–38).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations, and therefore was not entitled to DIB. (Tr. 38).

On appeal, Plaintiff argues that: (1) the ALJ violated the "treating physician" rule; (2) the medical expert's flawed testimony did not constitute substantial evidence; (3) the ALJ's rationale for disregarding the treating physician rule is contrary to law and the evidence; (4) even if the treating physician's medical opinion is not entitled to controlling weight, it nonetheless deserves the greatest weight; (5) the ALJ failed to properly assess claimant's pain under SSR 96–7p; and (6) the ALJ improperly relied on claimant's minimal daily activities to dismiss the severity of her symptoms. The Court will address each error in turn.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In performing this

review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir.1978). If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. As the Sixth Circuit has explained:

"The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen,* 35 F.3d 1027, 1035 (6th Cir.1994).

The claimant bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, she must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

### A.

The record reflects that:

Plaintiff alleges disability due to degenerative disc disease of the lumbar spine, osteoarthritis in both hands with right thumb and left thumb conditions, a history of hernia surgeries, obesity, and vocal cord infection. (Tr. 24).

#### a. *Degenerative disc disease of the lumbar spine*

Plaintiff had surgery in 1978 (at 16 years old), to remove tumors from her lumbar spine. (Tr. 29). Thereafter, in 1983 and 1985, Plaintiff underwent two additional back surgeries due to continued pain and issues with her discs. (*Id.*) Plaintiff had a lumbar fusion in 1994. (*Id.*) However, Plaintiff continued to seek out medical treatment to reduce her back pain. (*Id.*) For example, Plaintiff received massage therapy and a facet injection in December 2000. (*Id.*)

On May 2, 2002, Plaintiff submitted to SI joint injection on the right side. (Tr. 29). Thereafter, on May 6, 2002, Plaintiff presented for evaluation by Dr. Zeff due to left low back pain and right leg pain. (*Id.*) Dr. Zeff noted that Plaintiff demonstrated a normal gait, she was able to walk on her heels and toes, she could flex her lumbar spine about 90 degrees, extend about 20 degrees, and laterally bend 20 degrees. (*Id.*) Dr. Zeff acknowledged that x-rays taken on May 6, 2002 showed hardware was in place and her bones were lined up well with good disc height. (*Id.*) Dr. Zeff indicated Plaintiff had right sacroiliitis and ordered a right sacroiliac joint injection and physical therapy. (*Id.*) On September 3, 2002, Plaintiff had a lumbar selective nerve block at L5 and S1 on the right side. (*Id.*)

On July 14, 2008, October 1, 2008, January 20, 2008, February 5, 2009, February 11, 2009, February 19, 2009, February 23, 2010, March 1, 2010, September 24, 2010, April 5, 2011, July 18, 2011, and October 14, 2011, Dr. Kadakia examined Plaintiff. (Tr. 29). These progress notes are generally illegible, but show that Plaintiff was seeking medical care. (*Id.*) Dr. Kadakia referred Plaintiff to Dr. Minhas for pain management care. (*Id.*) Diagnostic reports also show that Dr. Kadakia referred Plaintiff for testing. (*Id.*)

On August 28, 2009, Plaintiff had an MRI of her lumbar spine, which showed

artifacts due to metal hardware in the lower lumbar spine. (Tr. 29). There was fusion at the three lower lumbar discs (L3–L4, L4–L5, and L5–S1), but the upper spine appeared normal. (*Id.*) The neural foramina were patent at L3–L4 and L4–L5. (*Id.*) Dr. Kadakia referred Plaintiff for lumbar epidural steroid injections on October 23, 2008, February 24, 2009, May 8, 2009, November 16, 2009, and November 30, 2009. (Tr. 29–30). After the November 2009 injections, Plaintiff requested a spinal cord stimulator. (Tr. 30).

Plaintiff presented for appointments with Dr. Minhas on January 1, 2004, April 2, 2004, August 14, 2004, March 6, 2006, April 21, 2006, March 7, 2007, August 1, 2007, September 21, 2007, November 7, 2007, April 10, 2008, October 2, 2008, October 30, 2008, December 4, 2008, January 8, 2009, February 5, 2009, March 5, 2009, April 2, 2009, April 9, 2009, May 28, 2009, June 25, 2009, July 30, 2009, August 27, 2009, September 24, 2009, October 22, 2009, November 19, 2009, December 17, 2009, January 1, 2010, and February 11, 2010 for pain management reviews. (Tr. 30). These progress notes reflect that Plaintiff showed some improvement with a medication regimen and home exercises. (*Id.*) Dr. Minhas continued the medication regimen, making adjustments as necessary. (*Id.*)

Additionally, Plaintiff followed up with Dr. Minhas on January 14, 2010 and February 11, 2010. (Tr. 30). Dr. Minhas continued a medication regimen for controlling Plaintiff's pain. (*Id.*) On March 11, 2010, Plaintiff complained of aching and stabbing pain in her back, buttock, and legs. (*Id.*) Dr. Minhas examined Plaintiff and continued her pain medication regimen. (*Id.*) On May 13, 2010, Plaintiff followed-up with Dr. Minhas reporting that she was doing "fair" and ranked pain as an "8" on a scale of 1 to 10 with "10" being the most severe pain. (*Id.*) Plaintiff described the pain as aching, burning pain in the neck and upper back, pain in the left arm, right buttock, and leg. (*Id.*) After examination, the impression was chronic pain syndrome, post laminectomy syndrome, degenerative disc disease of lumbar spine, neuropathic pain, sacral-ileitis, right hip tendonitis, obesity, and fibromyalgia. (*Id.*) Dr. Minhas continued a medication regimen and instructed Plaintiff on neck exercises. (*Id.*)

On June 10, 2010, Plaintiff followed-up with Dr. Minhas reporting that Zonegran was helping with her breakthrough pain. (Tr. 30). Dr. Minhas assessed chronic pain syndrome, post laminectomy syndrome, degenerative disc disease of the lumbar spine, neuropathic pain, sacroiliitis, right hip tendinitis, obesity, fibromyalgia and constipation. (*Id.*) He continued her medication of Zonegran, Klonopin, Skelaxin, Senoket, Amitriptyline, Ambien, Nuvigil, and Opana ER. (*Id.*) Plaintiff was encouraged to do home exercises and follow-up in four weeks. (*Id.*) On July 8, 2010, Plaintiff returned for follow-up visit with Dr. Minhas complaining of pain in the right hip, especially when walking and going up and down stairs. (*Id.*) Her medication regimen was continued. (*Id.*)

On August 2, 2010, Plaintiff presented for examination by Dr. Minhas complaining of extreme burning pain in the neck and both sides of the shoulder. (Tr. 31). Plaintiff described her pain as stabbing, aching, and radiating down into right leg. (*Id.*) Dr. Minhas continued her pain medication regimen. (*Id.*) On September 28, 2010, Plaintiff returned for a follow-up, reporting that the trigger point injection did not help and that an epidural injection was pending. (*Id.*) Plaintiff indicated that she performed some volunteer work and that her mood and sleep were "fair." (*Id.*) Upon physical examination, Dr. Minhas

noted that Plaintiff was well built, well nourished, and in no acute distress. (*Id.*) Her vital signs were stable and she was continued on Opana ER, Celebrex, Nuvigil, Ambien, Nucynta, Zonegran, and Amitriptyline. (*Id.*) She was encouraged to perform home exercises. (*Id.*)

On March 21, 2011, Dr. Minhas completed an "Attending Physician's Return to Work Recommendations." (Tr. 31). Specifically, Dr. Minhas found that Plaintiff was limited to work with no standing/walking, only 1–3 hours of sitting, and 1–3 hours of driving. (*Id.*) He found that Plaintiff was able to use hands for repetitive simple grasping. (*Id.*) Additionally, she could use her feet for repetitive movements, as in operating foot controls. (*Id.*) Plaintiff was also limited to occasional bending, squatting, climbing, and use of vibrating tools. (*Id.*) Ultimately, Dr. Minhas found that Plaintiff was unable to sustain any gainful employment. (*Id.*)

On September 26, 2011, Plaintiff followed up with Dr. Minhas for pain management review. (Tr. 31). She reported some swelling of her legs and an aching, burning, stabbing pain in her neck and upper back radiating into her shoulder and arm. (*Id.*) She also complained of pain in her mid and lower back. (*Id.*) Dr. Minhas continued Plaintiff's medications and encouraged home exercises. (*Id.*)

On October 13, 2011, Dr. Minhas' progress notes reflect that Plaintiff started therapy on October 11, 2011 to help with her neck and jaw injury from a motor vehicle accident. (Tr. 31). Plaintiff rated her pain as a "6" on a scale of 1 to 10 with "10" being the most severe pain. (*Id.*) She indicated that her pain regimen caused some drowsiness and lack of ability to concentrate. (*Id.*) Plaintiff's physical examination was normal except for some notes regarding her obesity and anxiety. (*Id.*) Thereafter, on October 13, 2011, Dr.

Minhas continued Plaintiff on the same medications and home exercise program. (*Id.*) On November 11, 2011, Dr. Minhas acknowledged that Plaintiff reported "doing better" after the motor vehicle accident. (*Id.*) Plaintiff attended physical therapy with some positive results and Dr. Minhas continued the same medication regimen. (*Id.*) On November 18, 2011, Dr. Minhas examined Plaintiff again. (*Id.*) Dr. Minhas continued her medication regimen and recommended home exercise on a regular basis. (Tr. 32). He also ordered physical therapy for the lumbar spine. (*Id.*)

On December 9, 2011, Plaintiff presented for follow-up examination, complaining of "stabbing, burning pains" on her right side, which almost caused her to fall down. (Tr. 32). She expressed feeling scared about falling. (*Id.*) Plaintiff again reported lack of concentration as a side effect of medication as well as constipation and sleepiness. (*Id.*) Dr. Minhas' physical examination of Plaintiff noted a flat affect and mood. (*Id.*) Plaintiff returned for follow-up care with Dr. Minhas and she reported that "pain is tolerable with medications." (*Id.*) Dr. Minhas continued Plaintiff on Flobee, Baclofen, Opana ER, Nucynta, Ambien CR, Zonegran, Seroquel, Cymbalta, and her range of motion exercises. (*Id.*)

On January 9, 2012, Plaintiff reported that she was not working, but was on the School Board. (Tr. 32). Plaintiff described her pain as an aching and burning sensation exacerbated by movement such as walking, standing, sitting, lying down, and lifting. (*Id.*) She also stated that her family relationships were worse as was her overall functioning. (*Id.*) Dr. Minhas suggested an epidural injection as well as a home exercise program, biofeedback, relaxation, and meditation techniques with

behavioral activation.[2] (*Id.*) On January 17, 2012, Plaintiff received right L2 and S1 selective epidural injections due to complaints of low back and right leg pain. (*Id.*) On February 6, 2012, Plaintiff followed up with Dr. Minhas because the pain increased on her right side and the injection provided only short-term relief. (*Id.*) Plaintiff reported having more trouble sleeping and walking due to the increased pain. (*Id.*)

Subsequently, on April 2, 2012, Plaintiff presented for examination by Dr. Minhas complaining of pain in the bilateral lower back, bilateral mid-back, neck, both shoulders, and entire area and bilateral upper back with radiation to the right leg. (Tr. 32). She rated her pain as a "7" on a scale of 1 to 10 with "10" being the most severe pain. (*Id.*) Plaintiff described pain as "aching and burning" and reported that her pain was worse with movement (i.e. walking, standing, sitting, and bending). (*Id.*) Plaintiff indicated that the current treatment regimen helped relieve about 70% of her pain. (*Id.*) However, she complained of side effects from her current regimen. (*Id.*) Upon physical examination, Dr. Minhas noted that Plaintiff demonstrated normal range of motion in her extremities with no clubbing, cyanosis, edema, or tenderness. (*Id.*) Dr. Minhas instructed Plaintiff to perform a home exercise program with a stretching/ROM routine and walking as tolerable. (*Id.*) He further advised Plaintiff to engage in biofeedback, relaxation, and meditation techniques. Behavior activation was also encouraged. (*Id.*) Dr. Minhas instructed Plaintiff to continue taking her medications as directed and needed. (*Id.*)

On April 30, 2012 the progress notes from Dr. Minhas revealed that Plaintiff returned for a follow-up visit for pain management. (Tr. 33). She complained of pain in the head, right leg, bilateral lower back, bilateral mid-back, neck, and both shoulders. (*Id.*) She rated her pain as a "5" on a scale of 1 to 10 with "10" being the most severe pain. (*Id.*) Again, Plaintiff described pain as "aching and burning" and reported that her pain was worse upon movement such as walking, standing, sitting, and bending. (*Id.*) Plaintiff reported burning in her right hip and leg with excruciating pain and difficulty when climbing stairs. (*Id.*) X-rays of the lumbar spine showed hardware intact with 3–level fusion with possible foraminal stenosis, degenerative disc disease of the lower thoracic vertebrae with spondylosis. (*Id.*) Dr. Minhas indicated that surgical options were discussed and he advised Plaintiff to continue her home exercise program with stretching/ROM routine, biofeedback, relaxation, and meditation techniques. (*Id.*) He also promoted behavioral activation. (*Id.*) Dr. Minhas increased Plaintiff's Trileptal and added Zipsor to her medication routine. (*Id.*)

Dr. Minhas completed another "Attending Physician's Return to Work Recommendations" on April 30, 2012. (Tr. 33). Dr. Minhas found that Plaintiff was able to stand/walk for 1–4 hours, sit for 1–3 hours, and drive for 1–3 hours. (*Id.*) Additionally, he determined that Plaintiff was able to use hands for repetitive simple grasping, pushing, pulling, fine manipulation, and could frequently use vibrating tools. (*Id.*) Dr. Minhas also assessed that Plaintiff could never bend, squat, or climb. (*Id.*) Dr. Minhas opined that Plaintiff was "unable to sustain any gainful employment" and indicated that these restrictions were "permanent." (*Id.*)

---

**2.** Behavioral activation is a treatment for depression where the patient works to accomplish activities that improve his or her mood.

Subsequently, on May 31, 2012, Plaintiff returned for a follow-up visit with Dr. Minhas for pain management. (Tr. 33). Plaintiff complained of pain in her bilateral lower back, mid-back, upper back with radiation to her right leg, neck, and both shoulders. (*Id.*) Plaintiff rated her pain a "5" on a scale of 1 to 10 with "10" being the most severe pain. (*Id.*) Again, Plaintiff described pain as "aching and burning" and reported that her pain was worse upon movement such as walking, standing, sitting, and bending. (*Id.*) Plaintiff indicated that her current regimen relieved 60% of her pain. (*Id.*) Dr. Minhas noted that Plaintiff was doing "fair" and was still volunteering on the School Board. (*Id.*) Dr. Minhas continued her medication regimen and encouraged her to continue her home exercise program with a stretching/ROM routine, biofeedback, relaxation, and medication techniques. (*Id.*) Dr. Minhas promoted behavioral activation. (*Id.*)

### b. Right thumb conditions

The evidence provides that as early as January 14, 2002, Plaintiff complained of pain in her right hand. (Tr. 26). X-rays showed some spur formation with degenerative change of the first metacarpal joint, but no evidence of acute bony injury. (*Id.*) Thereafter, Plaintiff presented for examination by Dr. Willis on May 13, 2009. (*Id.*) Physical examination demonstrated both CMC joints were enlarged. (*Id.*) She was particularly tender to palpation on the right thumb CMC joint, to a much lesser degree at the left thumb. (Tr. 26–27). She had mild swan neck deformity developing at the MP joint.[3] (Tr. 27). The exam of the right middle finger

demonstrated tender Notta's node at the A1 pulley.[4] (*Id.*) There was mild inducible triggering on exam, but no other digits demonstrated evidence of stenosing tenosynovitis. (*Id.*) Radiographs in three views of the right hand showed fairly advanced degenerative osteoarthritis of the thumb CMC joint with radial subluxation of the thumb metacarpal base of the palmar trapezium. (*Id.*) This condition had significantly progressed since the last radiographs in 2007. (*Id.*) Dr. Willis prescribed hand therapy and instructed her to continue with medications to reduce the pain. (*Id.*)

Thereafter, on April 7, 2010, Plaintiff submitted to right thumb exploration and removal of scar tissues. (Tr. 27). On September 22, 2010, due to persistent symptoms of her right thumb base, Plaintiff noted significant discomfort with pinching, grasping, and heavy hand use. (*Id.*) Dr. Willis noted discomfort to palpation at the CMC joint of the right thumb base. (*Id.*) There was obvious crepitace and pain with circumduction. (*Id.*) Radiographs confirmed substantial subluxation of the metacarpal base. (*Id.*) There was substantial interval worsening since previous radiographs, but no other acute evidence of fracture, subluxation, or dislocation. (*Id.*) Dr. Willis and Plaintiff discussed options and decided to refurbish and refashion her splints to accommodate her increased deformity. (*Id.*) Due to on-going pain and limited usage, on July 21, 2011, Plaintiff underwent right trapezium excision, ligament reconstruction, and tendon reconstruction. (*Id.*) A follow up appointment dated October 12, 2011 shows that Plaintiff was 10 weeks post right thumb CMC joint

---

**3.** Swan-neck deformity is a deformed position of the finger involving a bending in of the base of the finger, a straightening out of the middle joint, and a bending in the outermost joint.

**4.** The A1 thumb pulley is an area of slightly thicker connective tissue that prevents tendons from bowing during finger flexion. It is located at the base of the thumb.

trapezium excision and ligament reconstruction tendon interposition arthroplasty. (*Id.*) She noted decreased discomfort and swelling and was instructed to work on active and passive range of motion of the digits, wrist, and elbow. (*Id.*)

### c. Left thumb conditions

The evidence of record reflects that on February 20, 2002, Plaintiff presented for evaluation of her left thumb due to pain that increases with grasping and pinching-type activities. (Tr. 27). X-rays demonstrated mild degenerative arthosis of the CMC joint of the left thumb. (*Id.*) Dr. Willis assessed trigger thumb and recommended surgery. (*Id.*) On February 22, 2002, Plaintiff submitted to a release of left trigger thumb.[5] (*Id.*) On March 20, 2002, Plaintiff presented for a follow-up examination and reported using the thumb and indicated significantly improved range of motion and decreased discomfort. (*Id.*) Dr. Willis instructed Plaintiff regarding care and use of her hand as well as scar massage, desensitization, and range of motion. (*Id.*)

On July 10, 2002, Plaintiff presented for reevaluation status/post trigger thumb release. (Tr. 27). She complained of stiffness, especially with activity such as gripping, pinching, grasping, and turning activities of the hand. (*Id.*) Dr. Willis assessed Plaintiff with left CMC degenerative arthritis with subacule and mildly symptomatic tendonitis at the right ring and left index A1 pulley levels. (Tr. 27–28). He recommended continued conservative care for the trigger fingers, which were mildly symptomatic. (Tr. 28). Plaintiff requested more aggressive treatment for her CMC thumb joint and agreed to an injection. (*Id.*)

On July 24, 2002, Plaintiff followed-up after receiving an injection in her left CMC joint. (Tr. 28). She reported no significant relief from the injection. (*Id.*) On physical examination, the left CMC joint demonstrated residual crepitus. (*Id.*) She had some mild crepitation along the flexor tendon of the thumb, although there was no triggering at the area of the A1 pulley, which was previously released. (*Id.*) She had tenderness of the index A1 as well with crepitus, but no overt or inducible triggering. (*Id.*) Examination of the right hand demonstrated tenderness at the ring and small finger A1 pulleys, worse at the ring, with inducible triggering and nodular thickening. (*Id.*) Overall, Plaintiff's distal sensibilities and perfusion remained excellent. (*Id.*) Dr. Willis assessed multiple trigger digits and first carpometacarpal degenerative arthrosis of the left hand. (*Id.*) Plaintiff continued with conservative treatment. (*Id.*)

On January 24, 2010, Plaintiff presented in the emergency room after attempting to open up a bottle when she suffered a laceration to her left thumb. (Tr. 28). Upon examination, Plaintiff demonstrated full range of motion and no tenderness was noted. (*Id.*) Plaintiff received a tetanus prophylaxis, but the x-ray was negative. (*Id.*)

On March 3, 2010, Dr. Kadakia, Plaintiff's primary care physician, ordered an MRI of the left thumb and hand due to Plaintiff's complaints of swelling and persistent pain. (Tr. 28). The MRI showed no evidence of abscess or bony infections and no gross evidence of tendon laceration. (*Id.*) However, on March 10, 2010, Plaintiff presented for examination by Dr. Willis due to residual symptoms in her left

---

5. Release surgery for trigger finger involves breaking apart the constriction that is pre-

venting the smooth motion of the tendon.

thumb. (*Id.*) She showed a thickening region of scar around the IP flexor crease and some discomfort to the distal region with minimal sensory disturbance. (*Id.*) Dr. Willis assessed residual scar hypersensitivity and suggested a course of therapy to work on mobilization and desensitization. (*Id.*)

On April 7, 2010, Plaintiff presented for examination due to left thumb concerns. (Tr. 28). Plaintiff reported that hand therapy produced only modest improvements. (*Id.*) She claimed that she had retained a foreign body in her thumb and she demonstrated a sharp discomfort in this region. (*Id.*) She also showed mild distal limited sensation. (*Id.*) Dr. Willis felt that Plaintiff had a foreign body in her thumb and recommended thumb exploration, removal of scar tissues, possible foreign body removal, and possible neuroma excision. (*Id.*) On April 28, 2010, Plaintiff followed-up with Dr. Willis regarding left thumb concerns. (Tr. 28–29). Plaintiff was seven days post operation for removal of a small piece of glass from her left thumb. (Tr. 29). The physical examination showed her incision was healing. (*Id.*)

#### d. Hernia surgeries

The evidence shows that in 2006 Plaintiff had hernia repair surgery. She also underwent hernia repair surgery on July 15, 2008. (Tr. 24–25). On February 21, 2012, Plaintiff presented for surgical evaluation for an umbilical hernia by Dr. Juergens. (Tr. 25). Plaintiff reported pain, tenderness, and cramping for at least three weeks. (*Id.*) However, the pain had been deep in the umbilicus and had occurred intermittently for the last three months. (*Id.*) Dr. Juergens confirmed that abdominal wall hernias were present around the old incisional area and prior repairs. (*Id.*) He recommended corrective repair surgery, and on March 9, 2012, Plaintiff sub-

mitted to a laparoscopic repair recurrent incarcerated incisional hernia, with mesh. (*Id.*) Plaintiff had prior abdominal surgery with hernia repair, but she had a tender enlarging defect present in the midline of the abdomen, up above the umbilicus in the region of her prior incisions made from her surgery in 2008. (*Id.*) Plaintiff had progressive distention, tenderness, and pain in this area, and presented on March 9, 2012 for repair. (*Id.*)

On March 20, 2012 and March 27, 2012, Plaintiff followed-up for reexamination by Dr. Juergens complaining of left-side abdomen pain radiating into the back. (Tr. 25). Upon examination, Plaintiff ambulated without difficulty, but showed a mildly tender abdomen. (*Id.*) Dr. Juergens noted that there were no abdominal wall hernias present. (*Id.*) Plaintiff's incisions were tender but healing and repair was intact. (*Id.*) Thereafter, on April 10, 2012, Plaintiff returned for examination and reported that she had resumed minimal activities. (*Id.*) Dr. Juergens acknowledged that Plaintiff had a normal physical examination and instructed Plaintiff to return to her normal activities over the next two weeks and call or follow-up as needed. (*Id.*)

#### e. Obesity and gastric bypass surgery

Plaintiff submitted to gastric bypass surgery on July 2, 2007. (Tr. 25). Plaintiff weighed approximately 276 pounds at the time of her surgery, but lost a significant amount of body weight after the surgery. (*Id.*) A progress note dated July 7, 2008 states that Plaintiff lost 117 pounds, which was 66% of her excess body weight. (*Id.*)

#### f. Damaged vocal cords

The evidence of record shows that on May 18, 2010, Plaintiff presented for examination before Dr. Devore due to a two year history of progressive, raspy voice

not related to a cough or shortness of breath. (Tr. 25–26). Dr. Devore's impression was vocal overuse with nodules, deviate nasal septum, and right thyroid nodule with no clinical symptoms. (Tr. 26). He ordered a thyroid ultrasound and voice lab work up. (*Id.*) On May 20, 2010, Plaintiff underwent an examination at The Professional Voice Center of Greater Cincinnati where she demonstrated moderate dysphonia [6] characterized by a deep, husky, gravelly hoarseness for the past two years. (*Id.*) She was on a ventilator for four days following complications during gastric bypass surgery in 2008. (*Id.*) The examination revealed significant bilateral true vocal fold edema and erythema as well as nodular thickness. (*Id.*) The voice pathologist recommended eliminating all phonotraumatic behaviors, direct voice therapy focusing on resonant voice therapy, vocal function exercises, and strict compliance with oral hydration and vocal hygiene. (*Id.*)

The thyroid ultrasound conducted on May 25, 2010 showed no significant abnormality and no discrete solid mass. (Tr. 26). On July 2, 2010 and July 13, 2010, Plaintiff returned to Dr. Devore to diagnose and resolve laryngeal candidiasis. (*Id.*) Plaintiff was also instructed to be more diligent with voice exercises. (*Id.*) The Professional Voice Center's progress notes from May 16, 2010 through July 16, 2010 are generally illegible, but show that Plaintiff received treatment for her voice loss. (*Id.*)

Subsequently on May 17, 2012, Plaintiff presented for examination at Queen City ENT, complaining of a history of acid reflux and vocal complaints. (Tr. 26). Plaintiff reported that she developed these issues after her gastric bypass surgery, which left her intubated for four days. (*Id.*) Initially, Plaintiff treated with proton pump inhibitors. (*Id.*) Plaintiff claimed that her voice gets worse as the day progresses and sounds gravelly and rough. (*Id.*) Upon physical examination, Dr. Schwetschenau found significant posterior glottis erythema and edema consistent with laryngopharyngeal reflux, mild vocal fold edema, and questionable scar band adhesion at the anterior commissure. (*Id.*) Dr. Schwetschenau assessed vocal dysfunction of uncertain etiology and ordered a course of proton pump inhibitors. (*Id.*) If these inhibitors failed to alleviate Plaintiff's symptoms, Dr. Schwetschenau indicated that she would arrange for a repeat videostroboscopy. (*Id.*)

## B.

First, Plaintiff alleges that the ALJ violated the "treating physician" rule when she adopted the unsupported and conclusory opinion of Dr. Janese, the non-examining, reviewing medical expert, that Plaintiff could do a full range of medium work.

Dr. Minhas opined in 2012 that Plaintiff was precluded from bending, squatting, or climbing. (Tr. 33). He also found that Plaintiff was only able to stand/walk for 1–4 hours, sit for 1–3 hours, and drive 1–3 hours. (*Id.*) The vocational expert found that Dr. Minhas' limitations would preclude all employment. (Tr. 133–135). Despite these findings, the ALJ adopted the opinion of Dr. Janese, the non-examining, reviewing medical expert, who concluded that Plaintiff could perform medium work. (Tr. 33–34).

"In assessing the medical evidence supporting a claim for disability benefits, the ALJ must adhere to certain standards." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir.2009).

---

**6.** Dysphonia is the medical term for disorders of the voice.

One such standard, known as the treating physician rule, requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*Id.*

■ "The ALJ 'must' give a treating source opinion controlling weight if the treating source opinion is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Id.* "If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Id.*

Dr. Minhas is a pain management specialist and has treated Plaintiff for nearly a decade. Defendant maintains that Dr. Minhas failed to provide reasons and objective evidence to support his restrictive residual functional capacity. However, the record indicates that Plaintiff had four low back surgeries. (Tr. 29). These surgeries began in 1978 when Plaintiff was 16 and culminated with a fourth surgery in 1994 when Plaintiff underwent a spinal fusion. (*Id.*) Plaintiff's low back pain persisted despite these surgeries. (*Id.*) Two other doctors, Dr. Zeff and Dr. Kadakia, also re-ferred Plaintiff for testing regarding back and spinal issues. (*Id.*) Dr. Zeff diagnosed Plaintiff with right sacroiliitis and ordered a right sacroiliac joint injection and Dr. Kadakia referred Plaintiff for lumbar epidural steroid injections. (*Id.*)

Plaintiff also sought a variety of treatment modalities to alleviate her pain including massage therapy, facet injections, physical therapy, multiple nerve blocks, pain management care, spinal cord nerve stimulator, home exercises, bio feedback, relaxation techniques, meditation, and a TENS unit. These efforts were not successful in alleviating Plaintiff's pain, but do support her allegations of pain. (Tr. 19, 30, 32–34). As stated in SSR 96–7p,

Persistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medication, trials of a variety of treatment modalities in an attempt to find one that works or that does not have side effects, referrals to specialists, or changing treatment sources, may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms.

As part of a pain management plan, Plaintiff was also prescribed numerous medications, including powerful narcotics. (Tr. 34). Plaintiff testified that most recently she was prescribed Skelaxin, Zipsor, Trileptal, Opana ER, Nucynta, Nuvigil, Klonopin, Vitamin A, Senna, Norvasc, Flobee, and an Albuterol inhaler. (*Id.*) While taking these 12 medications, Plaintiff testified that she felt drowsy, fatigued, and had concentration problems due to their side effects. (*Id.*)

Plaintiff also has fairly advanced degenerative osteoarthritis of the right thumb and had two surgeries on the thumb in 2010 and 2011 at the recommendation of Dr. Willis. (Tr. 27–28). Dr. Willis similar-

ly recommended that Plaintiff undergo surgery on her left thumb due to degenerative arthrosis, which she had in 2002, followed by injections in subsequent years. (Tr. 28). She also underwent multiple surgeries in that hand in 2010, culminating in the removal of a foreign object. (*Id.*) Plaintiff testified that she wears splints on her hands and they hurt constantly. (Tr. 76).

Furthermore, Plaintiff underwent surgery for obesity in 2007. (Tr. 25). She had gastric by-pass that dropped her weight from 276 pounds to 185 pounds. (*Id.*) However, this surgery aggravated Plaintiff's stomach hernias by causing acid reflux. (*Id.*) Plaintiff underwent several subsequent hernia repair surgeries in 2006 and 2008. (*Id.*) In 2012, Dr. Juergens confirmed abdominal wall hernias were present around the old incisional area. (*Id.*) Plaintiff had another corrective repair surgery on March 9, 2012. (*Id.*) Plaintiff's vocal cords were damaged as part of the complications from her gastric by-pass surgery. (Tr. 26). Dr. Devore found significant bilateral true vocal fold edema and erythema as well as nodular thickness. (*Id.*) Dr. Schwetschenau's exam, two years later, found significant posterior glottis erythema and edema consistent with laryngopharyngeal reflux and mild vocal fold edema. (*Id.*)

Dr. Minhas' opinion is specifically supported by the diagnostic studies and objective evidence detailing Plaintiff's spinal and back problems. Additionally, the procedures and treatment provided by Drs. Zeff, Kadakia, Juergens, Devore, and Schwetschenau also support a finding that Plaintiff is more physically limited than found by the ALJ. "The ALJ 'must' give a treating source opinion controlling weight if the treating source opinion is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir.2009). As such, Dr. Minhas' opinion should have been given controlling weight.

The Commissioner's regulations establish a hierarchy of acceptable medical source opinions. The hierarchy begins at the top with treating physicians or psychologists, 20 C.F.R. §§ 404.1527(d)(2), § 416.927(d)(2). Next in the hierarchy are examining physicians and psychologists, who often see and examine claimants only once. *See* 20 C.F.R. § 404.1527(d), § 416.927(d). In general, more weight is given to examining medical source opinions than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. § 404.1527(d)(1), 416.927(d)(1). Still, non-examining physicians' opinions are on the lowest rung of the hierarchy of medical source opinions.

> The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker. For example, the opinions of physicians or psychologists who do not have a treatment relationship with the individual are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required to treating sources.

Social Security Ruling 96–6p.

■ Accordingly, under applicable law, Dr. Janese's opinion should have been afforded little, if any, weight. Dr. Janese does not have a treatment relationship with Plaintiff, Dr. Janese never examined Plaintiff, and unlike Dr. Minhas who treated Plaintiff for nearly a decade, Dr. Janese's opinion was based solely on a review of the evidence of record. Moreover, Dr. Minhas' opinion is supported by the treatment and procedures performed by several

other doctors including Drs. Zeff, Kadakia, Juergens, Devore, and Schwetschenau. The only contradictory opinion is from Dr. Janese, a non-examining reviewing physician. "The opinion of a non-examining physician is entitled to little weight if it is contrary to the opinion of the claimant's treating physician." *Shelman v. Heckler,* 821 F.2d 316, 321 (6th Cir.1987).

█ The treating physician rule requires that "the ALJ provide 'good reasons' for discounting treating physician's opinions, reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 247 (6th Cir.2007). Here, the ALJ does not provide "sufficiently specific" or "good reasons" for discrediting the opinion of Dr. Minhas. Despite 10 single-spaced pages summarizing over 700 pages of a complex medical history, a decade long patient-doctor relationship, and numerous surgeries, procedures, testings, medications, and other objective evidence, the ALJ simply states that Dr. Minhas "failed to support his residual functional capacity with objective medical findings." (Tr. 31).

The ALJ's wholesale dismissal of the treating physician's opinion is the product of a failure to meaningfully apply the treating source rule in the context of the record as a whole. Here, the proof of disability is strong and the opposing evidence is lacking in substance.

## C.

█ Next, Plaintiff argues that the ALJ failed to properly assess her pain and improperly dismissed the severity of her symptoms.

The Sixth Circuit follows a two-step process in evaluating a claimant's subjective complaints of disabling pain. 20 C.F.R. § 416.929(a); *Rogers,* 486 F.3d at 247. First, the ALJ must determine whether the claimant has "an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms." *Rogers,* 486 F.3d at 247. Second, if such an impairment exists, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms on the [claimant's] ability to work." *Id.*

In this case, at the first step of the analysis, the ALJ found that Plaintiff had underlying medically determinable impairments that could cause disabling pain. (Tr. 19, 24). The ALJ acknowledged that the Plaintiff has had: (1) four low back surgeries, including a fusion; (2) numerous problems with both her right and left thumbs, including surgeries on both hands, and that she now uses braces on both hands; (3) gastric by-pass surgery followed by three separate corrective surgeries for her ensuing hernias, one of which damaged her vocal cords; and (4) ongoing pain that has not decreased even after numerous medications (including powerful narcotics), injections, massage, physical therapy, home exercise, biofeedback, relaxation and meditation techniques, behavior activation, and a TENS unit. (Tr. 24–34).

However, at step two of the analysis, the ALJ determined that Plaintiff's allegations of disabling pain were not credible. (Tr. 24). The ALJ concluded, even after acknowledging this lengthy list of treatments, that "the lack of more extensive treatment is inconsistent with the existence of disabling impairments." (Tr. 34). Plaintiff has had 13 separate surgeries, has sought pain management care for over a decade, and is currently on a regimen of 12 medications (including powerful narcotics). The ALJ fails to explain what more the Plaintiff could have done to meet an "ex-

tensive treatment" threshold in her disability analysis.

■■■ Additionally, the ALJ determined that Plaintiff's daily activities are contrary to a finding of disability. (Tr. 24). While an ALJ may "consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments," *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir.1990), the ALJ failed to offer a sufficient explanation of how Plaintiff's daily activities undermined her assertion of disabling pain. (Tr. 24).

Plaintiff lives in a house with her husband and daughter. Although the ALJ notes that Plaintiff is able to prepare simple meals, handle her finances, perform light household chores, drive, shop for snacks, serve on the School Board, and care for her personal hygiene needs, the ALJ leaves out important limiting facts. (Tr. 24). For example, Plaintiff can make a sandwich, *but* struggles to lift heavier pans; she is on the School Board which meets on a *monthly* basis; and she shops for snacks with her daughter, *but* her husband does the grocery shopping. (Tr. 20). Based on these daily activities, the ALJ concluded that Plaintiff is able to perform the physical demands of medium level work, including the ability to occasionally lift 50 lbs. and stand/walk for 6 hours a day, despite the fact that Dr. Minhas reported that Plaintiff could only stand/walk for 1–4 hours, sit for 1–3 hours, drive for 1–3 hours, and could never bend, squat, or climb. (Tr. 24, 33). Plaintiff testified that she can lift approximately 10–15 lbs., sit for approximately 15–20 minutes at a time, stand for approximately 20 minutes at a time, and walk for several blocks before stopping to rest. (Tr. 20).

The ALJ did not properly evaluate Plaintiff's subjective complaints of pain under step two of the analysis. As noted in 20 C.F.R § 404.1529(a), all symptoms, including pain, are considered in the disability analysis to the extent they are consistent with objective medical evidence. The ALJ recognized that objective evidence could account for Plaintiff's pain, and as such, the ALJ should have more fully considered Plaintiff's symptoms.

Plaintiff alleges that she is entitled to disability benefits beginning June 10, 2009. Although it is clear that Plaintiff was in considerable pain in 2009, there is not enough evidence in the record to suggest that on June 10, 2009 Plaintiff could not sustain full-time gainful employment. The evidence supports a finding that Plaintiff's pain was progressive, but there were no indications from any of Plaintiff's doctors in 2009 or 2010 that Plaintiff was incapable of gainful employment. However, Dr. Minhas' "Return to Work Recommendations" issued on March 21, 2011 coupled with the additional procedures, surgeries, and pain management regimens received prior to that date, support a finding that Plaintiff was unable to sustain gainful employment beginning March 21, 2011.

Accordingly, the ALJ's failure to appropriately assess Plaintiff's pain and the severity of her physical impairments and resulting functional restrictions was error.

### III.

■■■ When, as here, the non-disability determination is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 100, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991).

■■■ Generally, benefits may be awarded immediately "only if all essential factual

issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir.1994); *see also Abbott v. Sullivan,* 905 F.2d 918, 927 (6th Cir.1990); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 782 (6th Cir.1987).

■ The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher,* 17 F.3d at 176; *see also Felisky,* 35 F.3d at 1041; *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir.1985). Such is the case here.

■ Here proof of disability *is* overwhelming and remand will serve no purpose other than delay. As fully recited here, in view of the extensive medical record of evidence of disability, and the credible and controlling findings and opinions of Dr. Minhas, the ALJ failed to meet its burden of finding substantial evidence that Plaintiff is able to engage in substantial gainful activity. Instead, proof of disability is overwhelming.

**IT IS THEREFORE ORDERED THAT:**

The decision of the Commissioner, that Ava Strole was not entitled to disability insurance benefits, is hereby found to be **NOT SUPPORTED BY SUBSTANTIAL EVIDENCE,** and it is **REVERSED;** and this matter is **REMANDED** to the Commissioner for an immediate award of benefits beginning March 21, 2011. The Clerk shall enter judgment accordingly, and this case shall be CLOSED in this Court.