*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0343p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

THOMAS H. BLAKLEY,

               *Plaintiff-Appellant,*

    *v.*

COMMISSIONER OF SOCIAL SECURITY,

                  *Defendant-Appellee.*

No. 08-6270

> Appeal from the United States District Court
> for the Eastern District of Kentucky at London.
> No. 07-00436—Danny C. Reeves, District Judge.
>
> Submitted: April 23, 2009
>
> Decided and Filed: September 24, 2009
>
> Before: BATCHELDER, Chief Judge; SUHRHEINRICH and SUTTON, Circuit Judges.

_____

**COUNSEL**

**ON BRIEF:** Julie Anne Atkins, ATKINS LAW OFFICE, Harlan, Kentucky, for Appellant. Haila Naomi Kleinman, Holly A. Grimes, Mary Ann Sloan, SOCIAL SECURITY ADMINISTRATION, OFFICE OF GENERAL COUNSEL, Atlanta, Georgia, John S. Osborn III, ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, for Appellee.

_____

**OPINION**

_____

    SUHRHEINRICH, Circuit Judge. Thomas Blakley seeks review of a district court's judgment affirming the decision of an administrative law judge ("ALJ"), who denied Blakley's request for social security disability benefits. Blakley argues that the ALJ improperly rejected the opinions of his treating physicians and failed to provide reasons on the record for according them less than controlling weight. Because the ALJ failed to "give good reasons" for discounting the opinions of Blakley's treating physicians, in violation of

1

20 C.F.R. § 404.1527(d)(2), we **REVERSE** the judgment of the district court affirming the ALJ's decision and **REMAND** with instructions to return the claim to the Commissioner of Social Security ("Commissioner") for further proceedings consistent with this opinion.

## I.  Background

### A.  Factual Background

Born in 1959, Thomas Blakley was 47 years old at the time of the ALJ's decision. Blakley has a high-school education and worked in underground coal mines from 1979 until February 11, 2004, when he was injured while attempting to hang a six-inch pump line, which fell and hit him across his shoulder and neck.

Blakley was immediately seen at the emergency room following his accident. Thereafter, on February 19, 2004, Blakley's primary-care physician started him on a course of physical therapy.  On March 17, 2004, Blakley had two MRI scans, which showed degenerative disc disease of the cervical spine and a left rotator-cuff tear.  One of the MRI scans revealed disc-space changes between C5-C6 and C6-C7, a large disc osteophyte complex at C5-C6 with some flattening of the spinal cord, and large central disc osteophyte complex at C6-C7 with some flattening of the spinal cord.

Blakley began treatment with Dr. Steven Kiefer, a neurosurgeon, in April 2004. Based on Blakley's ongoing complaints of pain, Dr. Kiefer ordered a cervical myelogram and a corresponding cervical CT scan.  The cervical myelogram revealed osteophytes and disc protrusions on the cervical spine.  The CT scan confirmed this finding and also established that Blakley had narrowing of the neuroforamen at C5-C6, large hypertrophic boney spurs, and a mild disc bulge.  It further revealed boney spurs at C6-C7.

Based on these findings, Dr. Kiefer performed an anterior cervical discectomy of the C5-C6 vertebra on July 12, 2004.  Though the tests had also revealed problems with the C6-C7 vertebra, that area of Blakley's spine was not treated with surgery.  Dr. Kiefer followed up with Blakley on August 6, 2004, noting that Blakley was "coming along," had normal pain from surgery, had relief of radicular symptoms in his arms, but continued to have some trouble with his hands.

Dr. Kiefer also reviewed a May 2004 electrodiagnostic study and diagnosed Blakley with carpal tunnel syndrome. Dr. Kiefer prescribed wrist splints to help with Blakley's numbness and pain, and further noted that Blakley may need carpal tunnel surgery in the future.

At the next two follow-up visits with Dr. Kiefer, Blakley complained of continued pain in his right arm with bothersome intrascapular pain. He also complained of persistent numbness in the right thumb and index finger, and numbness in the right distal arm without pain.

On February 8, 2005, Blakley was seen again by Dr. Kiefer. This time, Dr. Kiefer noted that Blakley's complaints of aches and pains related to the neck were "in excess of what I would expect at this point." Dr. Kiefer ordered an MRI of Blakley's thoracic spine, which showed degenerative disc disease at T7-T8, T8-T9, and T9-T10 with disc protrusions. At both T7-T8 and T8-T9, the MRI showed disc material protrusion with an annular tear. On April 27, 2005, Blakley again reported to Dr. Kiefer that he continued to have intrascapular pain and left shoulder pain. Blakley also complained of upper thoracic pain with intermittent radiation into his anterior chest.

Contemporaneous with Dr. Kiefer's treatment, Blakley began treatment with Dr. Ben Kibler, an orthopedic surgeon, on May 4, 2004, for problems related to his shoulder. During Blakley's initial visit, Dr. Kibler reviewed Blakley's MRI, which showed that Blakley had a left rotator-cuff tear and bruising of the bone. On October 20, 2004, Dr. Kibler performed surgery to repair Blakley's rotator-cuff tear. Blakley's shoulder improved after surgery. By January 6, 2005, Dr. Kibler opined that Blakley would be out of work for another six weeks, after which "we can turn him loose." However, on January 24, 2005, Blakley filed an application for a period of disability and disability insurance benefits.

On February 18, 2005, Blakley reported to Dr. Kibler that his condition had worsened. He complained of soreness and tenderness and a feeling that something was catching in his shoulder. In his office notes, Dr. Kibler expressed, "I am not real sure why he has regressed."

On March 25, 2005, Blakley reported an improvement in his shoulder, but complained to Dr. Kibler of some acromioclavicular (AC) joint soreness and tenderness. On May 15, 2005, Blakley underwent an AC joint repair. On June 15, 2005, Blakley reported some soreness, but overall had better strength and range of motion after the AC joint surgery.

At the request of the Social Security Administration ("Agency"), Blakley was evaluated by Dr. Mark Burns in June 2005, shortly after Blakley's May 2005 AC joint repair. In his evaluation, Dr. Burns noted that Blakley had the ability to handle objects and had "normal gross manipulation and grip strength." Dr. Burns's examination also revealed "no clubbing cyanosis or edema . . . [and] no deformities, redness or tenderness" of Blakley's extremities. Dr. Burns also noted that Blakley "states he is now wearing wrist splints bilaterally with fair relief."

Dr. Burns determined that Blakley "has ability to perform activities involving sitting, standing, moving about, lifting, carrying, handling objects, hearing, seeing, speaking, and traveling" and that his physical and orthopedic examination were "within normal limits with the exception of decreased flexion and abduction involving the left shoulder." Dr. Burns opined that Blakley "will obtain full range of motion after continued intense physical therapy."

Two consulting state agency physicians performed a records review of Blakley's evidence and claims on June 30, 2005, and September 21, 2005, respectively. They determined that Blakley could lift 50 pounds occasionally, 25 pounds frequently, and sit, stand, or walk for six hours of an eight-hour workday. The state agency physicians also found that Blakley could climb ladders, ropes, and scaffolds occasionally, but he would be limited in his ability to reach in all directions. The physicians also adopted the June 2005 opinion of Dr. Mark Burns, who determined that Blakley "has ability to perform activities involving sitting, standing, moving about, lifting, carrying, handling objects, hearing, seeing, speaking, and traveling" and that his physical and orthopedic examination were "within normal limits with the exception of decreased flexion and abduction involving the left shoulder."

On August 19, 2005, after another follow up with Blakley, Dr. Kibler noted that Blakley continued to make progress and his range of motion continued to improve.

However, Blakley continued to complain of back pain, which Dr. Kibler thought may require some stabilization program. An October 18, 2005 radiography comparison showed that Blakley had some post-surgical changes of the AC joint with sclerosis on the surface of the left humeral head with possible necrosis or ostosis. On October 25, 2005, Dr. Kibler opined that most of Blakley's pain was related to his neck and back.

On December 18, 2005, Dr. Kibler restricted Blakley to "no more than 20 pounds lifting to his waist and no overhead lifting on a repetitive basis." In the report, Dr. Kibler explained that Blakley continued to have generalized problems, "some of which are related to his shoulder, a lot are related to his neck and back," all of which necessitated the restriction.

Dr. Kibler's office notes from February 16, 2006, revealed that Blakley continued to have some problems from his neck, back, and knees. Dr. Kibler also noted that Blakley showed "excellent strength in external rotation with arm down at the side" and that "[h]is x-rays do not show any abnormality of the AC joint or of the glenohumeral joint." Dr. Kibler concluded that "he may very well have some problems with the rotator cuff and AC joint but these are relatively minimal and are not giving him his functional disability."

In May 2006, at the request of Blakley's counsel, Dr. David Muffly performed an orthopedic consultative examination. In his report, Dr. Muffly reviewed Blakley's October 2005 functional capacity examination and adopted the recommendations of no overhead lifting and no more than 20 pounds from floor to waist level. Dr. Muffly noted that Blakley had normal arm strength but exhibited signs of carpal tunnel syndrome. Dr. Muffly assessed a 28% impairment to the whole body based on Blakley's cervical spine impairment, 11% for the shoulder impairment, and 36% for the combined impairment. He also calculated a 6% impairment (3% for each hand) for carpal tunnel syndrome. In Dr. Muffly's opinion, Blakley's carpal tunnel syndrome combined with his other impairments left him "totally disabled."

On June 8, 2006, Dr. Muffly completed another medical assessment. That assessment incorporated the 20-pound limitation, and further restricted Blakley from sitting, standing, or walking for more than three hours in an eight hour workday, no more than

occasional stooping, crouching, kneeling, or crawling, never climbing or balancing, and restrictions on reaching, handling, feeling, pushing, pulling, moving machinery, and heights.

Blakley was also seen for mental impairments.  Dr. Syed Raza, a psychiatrist, first saw Blakley on April 23, 2005, for a consultative evaluation at the Agency's behest.  Dr. Raza observed that Blakley was well groomed, had normal posture and gait, was oriented, and had fair memory.  Dr. Raza also noted Blakley had sleep difficulty, irritability, anhedonia, and feelings of helplessness.  Dr. Raza diagnosed a mood disorder resulting from Blakley's general medical condition and stated that the prognosis was guarded due to Blakley's poor understanding of the need for professional help.  Dr. Raza also found that Blakley would benefit from psychotropic medications, that Blakley had the ability to understand one- and two-step instructions, that Blakley had good concentration, but that he was unable to complete tasks in a normal time due to neck, shoulder, and hand pain.  Dr. Raza also opined that Blakley had poor coping skills and responded abnormally to pressure.

Dr. Raza subsequently began treating Blakley at the Cumberland Comprehensive Care facility beginning in November 2005.  In his November 2005 and January 2006 reports, Dr. Raza noted that Blakley exhibited mood disorders brought on by his medical conditions and that he isolated himself.  Blakley continued regular treatment with Dr. Raza through July 2006.

At the request of Blakley's counsel, Dr. Barbara Belew, a psychologist, provided a consultative examination of Blakley on May 24, 2006.  She reported that (1) Blakley's short-term visual memory was impaired, (2) he had evidence of emotional distress affecting several aspects of his life, (3) he appeared distressed, and (4) he had a tendency to withdraw.  Dr. Belew found that Blakley had developed symptoms of anxiety and depression, despite the fact that he was taking medication and participating in monthly therapy sessions.  Ultimately, Dr. Belew opined that, given Blakley's combination of features, there was adequate evidence to determine he is disabled.

### B.  Procedural History

The Commissioner denied Blakley's claim for benefits initially on July 20, 2005, and upon reconsideration on September 28, 2005.  Blakley subsequently requested a hearing before an ALJ.

That hearing was held on August 23, 2006.  Both Blakley and an impartial vocational expert testified.  Blakley testified to experiencing pain in his left shoulder, neck, and arms.  Blakley also reported numbness in his hands, making it difficult to pick things up.  During his testimony, Blakley explained that he is only able to raise his left arm half way before "it catches."  He also testified to feeling nervous and depressed since his accident, for which he was taking prescription medications.  Blakley further explained that his surgeon had inserted a titanium plate and screws into his neck, which causes Blakley to suffer "bad" headaches.  Blakley claimed that, as a result,  his neck becomes so tired during the day that he has trouble holding his head up.  As a result, Blakley reported having to lie down three or four times daily for 20 or 30 minutes to rest his neck.

The vocational expert testified that Blakley's prior jobs in the coal mines were medium and skilled.  The ALJ posed five hypothetical questions to the expert.  The ALJ's first hypothetical, upon which the ALJ ultimately relied, restricted Blakley to a "medium" level of exertion, no more than occasional climbing and reaching overhead, and a "seriously limited but not precluded" ability to deal with work stresses.  The expert responded that Blakley could not return to work as a roof bolter in the coal mines but could perform other "medium level" jobs, including cleaner, cashier, stock clerk, and hand packer.  The expert also opined that Blakley could perform light jobs.

On December 27, 2006, the ALJ issued her decision, holding that Blakley was not disabled under sections 216(i) and 223(d) of the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d).  The ALJ made Blakley's disability determination following the governing five-step analysis outlined in 20 C.F.R. § 404.1520.  At step one, the ALJ found that Blakley had not engaged in substantial gainful activity since his disability onset date.  At step two, the ALJ determined that Blakley suffered from a "severe" combination of impairments consisting of osteoarithritis, mood and anxiety disorders, stage II black lung, and residuals of cervical disc with allografting and plating, anterior cervical discectomy with allografting and plating, and

AC joint repair.  Third, the ALJ concluded that Blakley's impairments did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart B, Appendix 1.  Fourth, the ALJ adopted the state agency physicians' opinions and RFC determinations, finding that Blakley retained the residual functional capacity to perform a range of medium work, and that Blakley could "lift 50 pounds occasionally, 25 pounds frequently, and sit, stand, or walk about 6 hours of an 8 hour workday."  The ALJ determined that Blakley could also occasionally climb ropes, ladders, and scaffolds but could do no more than occasional reaching in all directions.  Blakely had, however, a limited ability to deal with work stresses.  At the fifth step, the ALJ concluded that, given Blakley's RFC, there were a significant number of jobs in the national economy that Blakley could perform.  Accordingly, the ALJ concluded that Blakley was not disabled.

The Appeals Council denied Blakley's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner of Social Security.  *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Blakley subsequently filed a complaint in the district court for review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

On August 12, 2008, upon cross-motions for summary judgment, the district court issued a memorandum opinion affirming the ALJ's decision, and entered an order granting summary judgment in favor of the Commissioner.  Blakley then filed this timely appeal.

## II. Analysis

### A. Standard of Review

In social security cases, the Commissioner determines whether a claimant is disabled within the meaning of the Social Security Act and, thereby, entitled to benefits.  42 U.S.C. § 405(h).  Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.  *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).  The substantial-evidence standard is met if a "reasonable mind might accept the relevant evidence as adequate to support a conclusion."  *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).  "The substantial-evidence standard . . . presupposes that there is a zone of choice within which the

decisionmakers can go either way, without interference by the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir.1986). Therefore, if substantial evidence supports the ALJ's decision, this Court defers to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Callahan*, 109 F.3d at 273. We give de novo review to the district court's conclusions on each issue. *Valley v. Comm'r of Soc. Sec.*, 427 F.3d 388, 390 (6th Cir. 2005).

### B. The Treating Physician Rule and the "Reason-Giving Requirement"

In assessing the medical evidence supporting a claim for disability benefits, the ALJ must adhere to certain standards. One such standard, known as the treating physician rule, requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because

> "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."

*Wilson*, 378 F.3d at 544 (quoting 20 C.F.R. § 404.1527(d)(2)).

The ALJ "must" give a treating source opinion controlling weight if the treating source opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson*, 378 F.3d at 544 (quoting 20 C.F.R. § 404.1527(d)(2)). On the other hand, a Social Security Ruling[1] explains that "[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent the with other substantial evidence in the case record." Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996). If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering

---

[1]Although Social Security Rulings do not have the same force and effect as statutes or regulations, "[t]hey are binding on all components of the Social Security Administration" and "represent precedent final opinions and orders and statements of policy" upon which we rely in adjudicating cases. 20 C.F.R. § 402.35(b).

a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. *Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(2).

Closely associated with the treating physician rule, the regulations require the ALJ to "always give good reasons in [the] notice of determination or decision for the weight" given to the claimant's treating source's opinion. 20 C.F.R. § 404.1527(d)(2). Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5. The *Wilson* Court explained the two-fold purpose behind this procedural requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Wilson*, 378 F.3d at 544. Because the reason-giving requirement exists to "ensur[e] that each denied claimant receives fair process," we have held that an ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight" given "*denotes a lack of substantial evidence*, even where the conclusion of the ALJ may be justified based upon the record." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007) (emphasis added).

Here, the ALJ favored the opinions of the state agency physicians over Blakley's treating sources, but as we demonstrate in the next section, the ALJ violated Agency regulations by failing to adequately explain the weight given to the treating physicians in her decision.

## C.  The ALJ Failed to Properly Evaluate Blakley's Treating Physicians

### 1.  Dr. Kiefer

The ALJ has placed nothing on the record indicating that she considered the opinion of Dr. Kiefer as a treating physician.  "Classifying a medical source requires us to interpret the definitions in [20 C.F.R.] § 404.1502, a question of law we review de novo."  *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007).  We accord substantial deference to any factual finding by the ALJ that bears on the question, however.  *Id.*  Here, the ALJ did not make any findings on the record with respect to Dr. Kiefer, so we do not defer to the ALJ's decision.

A physician is a treating source if he has provided medical treatment or evaluation and has had an ongoing treatment relationship with the claimant . . . "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation [that is] typical for the [treated condition(s)]."  20 C.F.R. § 404.1502.  Dr. Kiefer treated Blakley's neck injury and performed the discectomy.  As such, Dr. Kiefer developed an extensive treatment relationship, spanning over one year, and qualifies as one of Blakley's treating physicians.

In addition to performing Blakley's discectomy in July 2004, Dr. Kiefer provided ongoing medical notes for Blakley from April 2004 through April 2005.  Dr. Kiefer also continued to send Blakley for MRIs, CT scans, and x-rays based on Blakley's complaints of pain.  And those studies revealed objective findings of degenerative disc disease in the cervical and thoracic spine.  Dr. Kiefer expressed concern that the degenerative disc disease in Blakley's thoracic spine may require "aggressive" treatment.  Dr. Kiefer also made Blakley's diagnosis of carpal tunnel syndrome.  Therefore, as a treating physician, any opinions Dr. Kiefer made should have been given controlling weight absent justifiable reasons–made on the record–for discounting those opinions.  Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4-5.  However, Dr. Kiefer is not mentioned anywhere in the ALJ's opinion.

**2.  Dr. Kibler**

Dr. Kibler performed two surgeries on Blakley, a rotator cuff repair in October 2004 and AC joint repair in May 2005, and provided notes on Blakley from February 2004 through February 2006.  The ALJ rejected Dr. Kibler's assessment as follows:

> Although a treating physician [i.e., Dr. Kibler] indicated [Blakley] should not do more than 20 pounds lifting to his waist and no overhead lifting on a repetitive basis, the possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another.  Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension.  While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

Even assuming *arguendo* that the ALJ correctly reached her determination that Dr. Kibler should be discredited, the ALJ's summary rejection of Dr. Kibler without explaining the weight given his opinions falls short of the Agency's own procedural requirements: "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4.  "Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Id.*

**3.  Dr. Raza**

Dr. Raza began his relationship with Blakley as a consulting psychiatrist in 2004.  That relationship expanded to include treatment at the Cumberland River Comprehensive Care Center in 2005.  Though the ALJ summarizes Blakley's time at Cumberland, which is Dr. Raza's place of practice, the ALJ does not explain in her decision whether she weighed Dr. Raza as an expert, a treater, or both.  Here again, the

ALJ failed to account for Dr. Raza's opinions as a treating physician in disregard of 20 C.F.R. § 404.1527.

### D.  The State Agency Physicians' Opinions

The ALJ adopted the 2005 findings of the state agency physicians, as well as a state agency psychologist, in finding that Blakley was not disabled.[2]  As justification, the ALJ mentions only that "[t]he finding that the claimant can perform a range of medium work is consistent with the opinion of the State Agency medical consultants." Certainly, the ALJ's decision to accord greater weight to state agency physicians over Blakley's treating sources was not, by itself, reversible error.   "In appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."  Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3 (July 2, 1996).   One such circumstance may occur, for example, when the "State agency medical . . . consultant's opinion is based on a review of a complete case record that . . . provides more detailed and comprehensive information than what was available to the individual's treating source."  *Id.*

Here, however, the Agency's non-examining sources offered their opinions, upon which the ALJ relied, on June 30, 2005, and September 21, 2005.  Consequently, those non-examining sources did not have the opportunity to review, at minimum, Dr. Kibler's October 2005 assessment, Dr. Kibler's December 2005 restrictions, Dr. Muffly's June 2006 review, and Dr. Raza's psychiatric treatment records.  And because much of the over 300 pages of medical evidence reflects ongoing treatment and notes by Blakley's treating sources, "we require some indication that the ALJ at least considered these facts before giving greater weight to an opinion that is not 'based on a review of a complete

---

[2] In adopting the opinions and RFC determination given by the state agency physicians, the ALJ also dismissed Dr. Muffly and Dr. Belew's consultative opinions, stating that their "conclusory statements are inconsistent with the claimant's benign clinical examinations, objective tests, and conservative treatment history."  The ALJ further discredited Dr. Muffly's "generalized statements of disability" because (1) those "statements are inconsistent with the claimant's benign clinical examinations, objective tests, and conservative treatment history," (2) because Dr. Muffly saw Blakley "through attorney referral," and (3) because Dr. Muffly's opinion that Blakley is disabled requires a vocational analysis that is reserved to the Commissioner.

case record.'" *Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007) (quoting Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3).

### E. The Agency's Failure to Follow its Regulations Was Not Excusable Harmless Error

The *Wilson* Court instructs that where the ALJ fails to give good reasons on the record for according less than controlling weight to treating sources, we reverse and remand unless the error is a harmless *de minimis* procedural violation. *See Wilson*, 378 F.3d at 547. Such harmless error may include the instance where "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," or where the Commissioner "has met the goal of . . . the procedural safeguard of reasons." *Wilson*, 378 F.3d at 547. However, the ALJ's failure to follow the Agency's procedural rule does not qualify as harmless error where we cannot engage in "meaningful review" of the ALJ's decision. *Id.* at 544.

In this case, the ALJ's incomplete weighing of Blakley's treating sources is not an excusable *de minimis* procedural violation. First, we cannot engage in meaningful review of the ALJ's decision because her reasoning is not "sufficiently specific to make clear," Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5, that the ALJ recognized and evaluated the treating relationships of Drs. Kiefer, Kibler, and Raza. Second, we cannot tell whether the ALJ recognized that Dr. Raza treated Blakley for a significant period of time after his injury and was not only a consulting source.

Third, there is no evidence in the record that any of the recommendations of these treating sources is "so patently deficient that the Commissioner could not possibly credit it." *Wilson*, 378 F.3d at 547. To the contrary, Blakley's numerous x-rays, CT scans, and MRIs present objective findings that are, at the very least, not inconsistent with his treating physicians' opinions. And finally, even if we were to agree that substantial evidence supports the ALJ's weighing of each of these doctors' opinions, substantial evidence alone does not excuse non-compliance with 20 C.F.R. § 404.1527(d)(2) as harmless error. *See Wilson*, 378 F.3d at 546 ("[T]o recognize substantial evidence as a defense to non-compliance with § 1527(d)(2)[] would afford the Commissioner the

ability [to] violate the regulation with impunity and render the protections promised therein illusory. The general administrative law rule, after all, is for a reviewing court, in addition to whatever substantive factual or legal review is appropriate, to 'set aside agency action . . . found to be . . . without observance of procedure required by law.'" (quoting Administrative Procedure Act, 5 U.S.C. § 706(2)(D) (2001))).

The *Wilson* Court cautioned that an agency's failure to follow its own regulations may cause "unjust discrimination," "deny adequate notice," and consequently "may result in a violation of an individual's constitutional right to due process." *Wilson*, 378 F.3d at 545 (quoting *Sameena, Inc., v. U. S. Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998)). We publish this decision as a modest reminder--that the Commissioner must follow his own procedural regulations in crediting medical opinions.

### III.  Conclusion

In conclusion, the analysis supplied by the ALJ prevents this Court from finding that the Commissioner's decision is supported by substantial evidence. However, we do not decide today whether there is substantial evidence on the record to award or deny benefits because the Commissioner has discretion over that determination. Instead, we hold that the ALJ failed to follow the applicable procedural requirements in reaching her disability determination, which precludes meaningful review. We therefore **REVERSE** the judgment of the district court with instructions to **REMAND** to the Commissioner for further proceedings consistent with this opinion.