**NOT RECOMMENDED FOR PUBLICATION**
File Name: 18a0241n.06

**No. 17-6091**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| DARLENE SHIELDS, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellant, | ) | May 14, 2018 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| COMMISSIONER OF SOCIAL SECURITY, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

**BEFORE:  BOGGS, CLAY, and LARSEN, Circuit Judges.**

**BOGGS, Circuit Judge.**  Darlene Shields[1] appeals the district court's judgment affirming the Commissioner of Social Security's decision to deny her application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act") and supplemental security income ("SSI") under Title XVI of the Act.  Shields alleges that the Commissioner's residual functional capacity ("RFC") determination—i.e., an assessment of "the most [a claimant] can still do despite [her physical and mental] limitations," 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1)—was not supported by substantial evidence because the administrative law judge ("ALJ") (1) mischaracterized the "most probative" evidence and (2) improperly substituted his own medical judgments for those of the doctors involved.  As part of the latter claim, Shields argues that the ALJ violated Social Security Administration

---

[1] In the administrative record and the district court's opinion, the Appellant is referred to as "Darlena Shields."  In the briefs presented to this court, however, she is referred to as "Darlene Shields."  Despite the inconsistency, we will continue to refer to her by the latter name.

procedures when assigning "little" or "no" weight to the opinions of her treating and consultative physicians.

Because the ALJ failed to follow agency regulations requiring him to give good reasons for the weight assigned to a treating source's opinion, we reverse the judgment of the district court and remand with instructions that this case be returned to the Social Security Administration for further proceedings.

I

A

Darlene Shields is now 53 years old, has a high school diploma, and has experience as a cashier and a cook in fast-food settings, as well as experience in the retail industry. Since 2010, however, Shields has been unable to perform such work, allegedly due to her intolerance of those jobs' requirements for standing. Her last known job was in 2011, when she was self-employed as a babysitter.

On May 17, 2013, Shields filed Title II and Title XVI applications alleging disability beginning on March 17, 2012.[2] After these claims were denied, Shields filed a written request for a hearing. On September 16, 2015, a hearing was held, at which the claimant detailed her many medical issues. Among the ailments about which Shields testified were radiating back pain that inhibited her ability to drive, leg pain that was worse on her left side, arthritis in the left knee, swelling in her legs, breathing difficulties that included sleep apnea, partial blockages of her coronary arteries, diabetes, hypertension, carpal-tunnel syndrome, and anxiety and depression. She further stated that on a normal day, she could stand or walk for only five minutes at a time, that she could sit for no more than 15-20 minutes, that she was easily winded

---

[2] Shields had previously filed an application for Title II and Title XVI benefits. On March 16, 2012, following a hearing on the merits, those claims were denied.

by simple activities such as walking to her car, and that over the course of eight hours, she could sit for no more than four hours and could stand or walk for only one to two hours.

Medical records presented at the hearing substantiated many of Shields's claims regarding her physical health.[3] A lumbar-spine x-ray conducted in February 2014 found osteoarthritis, scoliosis, and arthritic degeneration, while an MRI performed two months later showed "a left foraminal [disc] protrusion impinging the exiting left L4 nerve root" and spinal stenosis at multiple levels. Similarly, an x-ray of Shields's left knee from February 2014 uncovered "[m]oderate tricompartmental osteoarthritis[,]" and a nerve-conduction and EMG study performed in May 2014 indicated that Shields suffered from moderate bilateral carpal-tunnel syndrome, which was more pronounced in her right hand.

Not all of the medical evidence, however, was unequivocal. While a cardiac catheterization performed in May 2013 showed, *inter alia*, that Shields suffered from a 40 percent narrowing of the left anterior descending artery and a 20 percent occlusion of the right coronary artery—which was indicative of "[m]oderate coronary artery disease mainly involving the proximal/mid left anterior descending" artery—her treatment was limited to "aggressive medical management," such as taking aspirin daily. Follow-up examinations that were conducted approximately one year later were similarly mixed: while they describe Shields's condition as having "not had any significant progression," they also state that she had symptoms consistent with congestive heart failure, was "[h]igh risk given her known underlying moderate coronary disease[,]" and was on "maximal medical therapy." A January 2015 record from Shields's cardiologist, Eric Lohman, M.D., further muddies the waters, as he described her as "doing well from a cardiac standpoint."

---

[3] Evidence was also presented regarding Shields's mental health. Because Shields only challenges the ALJ's assessment of her physical limitations, we do not discuss her mental-health history.

Shields's medical records contain similar discrepancies regarding her pulmonary and joint health. While an October 2014 pulmonary-function study states that Shields suffers from "severe" obstructive airways disease ("OAD"), those same records describe her as having had a "good response to bronchodilator therapy." When the test was repeated eight months later, it showed only "mildly severe" OAD and that Shields's lungs were clear to auscultation, palpation, and percussion—though occasional rhonchi were noted. Finally, even though June 2015 records from Shields's primary-care physician, Dr. Leroy Gallenstein, documented a medical history of chronic obstructive pulmonary disease ("COPD"), carpal-tunnel syndrome, coronary-artery disease, and pain in multiple joints, they also characterized her breathing sounds as "normal," her heart rate and rhythm as "regular . . . with no murmurs," and her joints as "normal" and having a "full range of motion."

Medical opinions regarding the extent of Shields's physical limitations were likewise conflicting. Aman Ghotra, M.D., who conducted a consultative examination of Shields in September 2013, assessed her as suffering from moderately decreased sensation in both her hands and feet, moderately decreased strength in her extremities, a weakened grip in her right hand, and reduced lumbar-spine flexion[4]; but he also noted a regular heart rate and rhythm and no wheezes, rhonchi, or crackles when she breathed. He further diagnosed Shields with degenerative disc disease but stated that she should be able to travel short distances unassisted. Based upon these considerations, Ghotra opined that Shields could sit in place for 30 minutes at a time, stand for 15-20 minutes, walk two blocks, lift and carry up to 15 pounds, and handle objects weighing less than 20 pounds.

Ghotra's assessment of Shields's ability to sit, stand, and walk was, however, disputed by Social Security Administration medical consultants. Rebecca Luking, D.O., who reviewed

---

[4] Ghotra rated the first three impairments as "3/5," where "5/5" indicates normal strength and functioning.

Shields's medical records in October 2013, criticized Ghotra's conclusions as "not [being] supported by [the] preponderance" of the medical evidence. Instead, Luking believed that Shields possessed the capacity to stand or walk for six hours in an eight-hour workday, to sit for six hours each workday, and to lift and carry 20 pounds occasionally and 10 pounds frequently. In April 2014, Luking's findings were adopted by a second agency medical consultant, Jack Reed, M.D.

A September 2015 medical assessment completed by Lohman—Shields's cardiologist—painted yet another picture of Shields's capabilities. Responding to a check-box questionnaire that was written by Shields's attorney—and that included a description of various conditions that Lohman had not treated, such as her degenerative disc disease, COPD, and carpal-tunnel syndrome—Lohman indicated that Shields could sit for no more than four hours in an eight-hour workday, could stand or walk for no more than two hours per workday, and could only occasionally lift 10 pounds.[5] Lohman also agreed that it was "more likely than not" that due to her medications and sleep apnea, Shields would be "off task" for more than 10 percent of the typical workday. He justified this latter conclusion by noting that Shields was taking three cardiac or cardiac-related drugs—Ranexa, isosorbide mononitrate, and hydrochlorothiazide—that cause daytime drowsiness.

B

In October 2015, Shields's DIB and SSI claims were denied. The ALJ who presided over her hearing concluded that Shields had a number of "severe" impairments that "impose[d] more

---

[5] The questionnaire's ambiguity further complicates matters. It states, "[w]ith reference to [Shields's degenerative disc disease, significant breathing problems in the nature of emphysema/COPD, coronary artery disease, and carpal-tunnel syndrome], and considering as well any and all conditions that you have diagnosed, please offer your assessment of M[r]s. Shields'[s] residual level of functioning . . . from 1/1/2014 to present and continuing[.]" It is therefore unclear whether Lohman based his opinion solely on his examinations of Shields.

than a minimal effect on [her] abilities to perform basic work-related activities." Specifically, the ALJ found that Shields suffered from:

> [COPD] with continued nicotine abuse; congestive heart failure, coronary artery disease, rule out cardiac syndrome X [i.e., chest pain that is not associated with a narrowing of the coronary arteries]; degenerative disc disease of the lumbar spine with disc bulges/protrusions at the L3/4 and L4/5 levels and grade I spondylolisthesis of L5 on S1; non-insulin dependent diabetes mellitus; degenerative joint disease of the [left] knee; bilateral carpal[-]tunnel syndrome; obstructive sleep apnea; obesity; anxiety disorder NOS (not otherwise specified); and major depressive disorder.

Nevertheless, he also held that those conditions did not meet or "medically equal" in severity the impairments that have been recognized as preventing one from engaging in substantial gainful activity.[6] *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926.

The ALJ then found that Shields possessed the RFC "to perform a reduced range of light work[,]"[7] subject to the qualification that:

> [s]he cannot climb ropes, ladders or scaffolds, but she can occasionally climb stairs or ramps. She can occasionally stoop, kneel, crouch or crawl. The claimant cannot perform aerobic activities such as running or jumping. She cannot work with her hands over the head. [She] cannot operate foot pedal controls. She should avoid exposure to concentrated dust, gases, smoke, fumes, temperature extremes, and excess humidity. She should avoid concentrated vibration or industrial hazards.

In reaching this conclusion, the ALJ gave "significant weight to the objective clinical findings" in the record,[8] but little-to-no weight to the functional capacity assessments submitted by

---

[6] An impairment is "medically equal" to one that is recognized as preventing substantial gainful activity "if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a); Pt. 404, Subpt. P, App. 1 (containing a list of the impairments recognized as preventing substantial gainful activity).

[7] Pursuant to 20 C.F.R. §§ 404.1567(b) and 416.967(b), light work involves the following:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

[8] Based on this evidence, the ALJ found that:

Lohman, Ghotra, Luking, and Reed. Specifically, he gave no weight to Lohman's sit/stand/walk assessment—even though Lohman was the only treating physician to submit a report and the only doctor whose report incorporated evidence (including some from other doctors) obtained after 2013—because the questionnaire asked him to "make assumptions, e.g., side effects of medications, which are beyond his experience with this patient and not strongly documented in the overall record." The ALJ further criticized Lohman's opinion for indicating that Shields suffered "extreme limitations . . . [that were] not compatible with his earlier statement of 'She is doing well from a cardiac standpoint'[.]" Regarding Ghotra's report, the ALJ accorded it "little weight" because the "extremely short sitting, standing, and walking intervals [contained therein were] not supported by the overall objective evidence." Finally, the ALJ gave "little weight" to the reports of the agency consultants because their "opinions predate some of the submitted evidence."

Following the testimony of a vocational expert, the ALJ concluded that Shields could no longer perform past relevant work but could make "a successful adjustment to other work that exists in significant numbers in the national economy." On this basis, he concluded that Shields was not disabled, as defined by the Social Security Act, from March 17, 2012 until October 23, 2015 (the date of the ALJ's decision). On July 21, 2016, the Appeals Council denied Shields's request for review, making the ALJ's decision the final decision of the Commissioner of Social Security.

---

[t]he claimant has coronary artery disease with mild stenosis of the left anterior and right coronary arteries, and she does not require stenting procedures. Her heart has held normal rate and rhythm across numerous clinical examinations. The claimant has significant [COPD] and unfortunately, she continues to smoke. However, her lungs are clear to auscultation and percussion. The claimant has musculoskeletal complaints including the lumbar spine, but she has no nerve-root impingement or neurological deficits, though she does have degenerative changes.

This assessment clearly erred in stating that Shields has no nerve-root impingement. As already noted, an April 2014 lumbar-spine MRI revealed that Shields suffered from "a left foraminal [disc] protrusion impinging the exiting left L4 nerve root."

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), Shields sought judicial review of the Commissioner's decision. Before the district court, she argued that the ALJ's RFC determination was not supported by substantial evidence, that he failed to properly consider the medical evidence regarding her physical limitations, and that he substituted his own judgment for the medical opinions contained in the record. The district court granted the Commissioner's motion for summary judgment, finding that the ALJ's decision was supported by substantial evidence, that the ALJ had given "sufficiently specific reasons for the weight given" to the various medical opinions, and that he had "painstakingly reviewed the available medical evidence." *Shields v. Berryhill*, No. 2:16-cv-170-JMH, 2017 WL 1960668, at *1, *5–7 (E.D. KY May 11, 2017). After the district court denied Shields's motion to alter or amend the judgment, this appeal followed.

Two days before this case was to be heard, the Commissioner filed a motion to postpone oral arguments due to intervening events. Specifically, the Commissioner informed the court that a state agency that adjudicated claims on the Commissioner's behalf had issued Shields a favorable determination on a *subsequent* disability application and, in doing so, had found that she was disabled as of August 25, 2014. Given that this result conflicts with the determination in this case that Shields was not disabled through October 23, 2015, the Commissioner asked for time to reconcile the inconsistent decisions. Then, at oral arguments, in response to our questioning, counsel for the Commissioner stated that the Social Security Administration was "committing to seeking a voluntary remand" under sentence six of 42 U.S.C. § 405(g) and assured the court that she "intend[ed] to . . . start working on that" motion immediately. Oral Argument at 4:15 (stating that the remand would be under sentence six), 5:19, 37:44, *Shields v. Comm'r of Soc. Sec.* (No. 17-6091), http://www.opn.ca6.uscourts.gov/inte

rnet/court_audio/aud2.php?link=audio/03-15-2018 - Thursday/17-6091 Darlene Shields v Comm

of Social Security.mp3&name=17-6091 Darlene Shields v Comm of Social Security.

Ten business days later, and only after we inquired about the status of the promised

motion to remand, we were informed that the Commissioner would not be filing any motion.

Suffice it to say, this course of conduct does not constitute best practices for those arguing before

us—or any court.

II

Administrative law judges use a five-step framework to determine whether a claimant is

disabled, as defined by the Social Security Act:

> The claimant must first show that she is not engaged in substantial gainful
> activity. Next, the claimant must demonstrate that she has a "severe impairment."
> A finding of "disabled" will be made at the third step if the claimant can then
> demonstrate that her impairment meets the durational requirement and "meets or
> equals a listed impairment." If the impairment does not meet or equal a listed
> impairment, the fourth step requires the claimant to prove that she is incapable of
> performing work that she has done in the past. Finally, if the claimant's
> impairment is so severe as to preclude the performance of past work, then other
> factors, including age, education, past work experience, and residual functional
> capacity, must be considered to determine if other work can be performed.

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 282 (6th Cir. 2009) (quoting *Foster v. Halter*,

279 F.3d 348, 354 (6th Cir. 2001)); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). During

the first four steps—which include a determination of the claimant's RFC—the claimant bears

the burden of proof. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

A. Standard of Review

We review de novo a district court's decision regarding Social Security benefits

determinations. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). "However, that review is

limited to determining whether the Commissioner's decision is supported by substantial evidence

and was made pursuant to proper legal standards." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d

365, 374 (6th Cir. 2013) (quoting *Cole*, 661 F.3d at 937). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). Provided that such evidence exists—and that the ALJ followed agency rules and regulations—we must affirm the Commissioner's decision. *Gayheart*, 710 F.3d at 374. This is true even if substantial evidence supports the opposite conclusion. *Ibid.*

That said, the existence of otherwise substantial evidence supporting the Commissioner's decision cannot excuse the failure of an ALJ to follow a mandatory regulation that "is intended to confer a procedural protection" for claimants. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543, 546–47 (6th Cir. 2004). "To hold otherwise . . . would afford the Commissioner the ability [to] violate the regulation with impunity and render the protections promised therein illusory." *Id.* at 546; *see also Cole*, 661 F.3d at 937 ("An ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009))).

### B. The Treating-Source Rule and the "Good Reasons" Requirement

One such mandatory procedural regulation is the "good reasons requirement," which is part of the "treating source" rule. *Wilson,* 378 F.3d at 544; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). A treating source is a:

> medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant] . . . [of] a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition(s).

20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  In general, medical opinions from a treating source are given more weight than those from a non-treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)[.]"  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  Medical opinions are defined as "judgments about the nature and severity of [the claimant's] impairment(s), including . . . symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [his or her] physical or mental restrictions."  20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1).

A treating source's medical opinion must be given controlling weight whenever it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record[.]"  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  Moreover, even if a treating source's medical opinion is not entitled to controlling weight, that does not mean that it should be rejected.  *Blakley*, 581 F.3d at 408.  Rather, at that point, the ALJ:

> *must* apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Wilson*, 378 F.3d at 544 (emphasis added); *see also Blakley*, 581 F.3d at 408 ("Treating source medical opinions [that are not accorded controlling weight] are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §[§] 404.1527[(c)] and 416.927[(c)]." (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4 (Soc. Sec. Admin. July 2, 1996))).[9]

---

[9] Effective March 27, 2017, SSR 96-2p was rescinded when the Social Security Administration published final rules that revised the rules and regulations applicable to the evaluation of medical evidence for claims filed on or after that

In addition, an ALJ must "give good reasons in [the] notice of determination or decision for the weight [given to the claimant's] treating source's medical opinion." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). According to a 1996 Social Security Ruling,[10] this regulation mandates that whenever an ALJ denies benefits, the decision:

> must contain specific reasons for the weight given to [a] treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5. The justification for this requirement is two-fold: (1) it helps a claimant to understand the disposition of her case, especially "where a claimant knows that h[er] physician has deemed h[er] disabled," and (2) it "permits meaningful review of the ALJ's application of the [treating-source] rule." *Wilson*, 378 F.3d at 544. We have been clear that we will remand "when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [that] we will continue remanding when we encounter opinions from ALJ's that do not *comprehensively* set forth the reasons for the weight assigned to a treating physician's opinion." *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) (emphasis added) (quoting *Wilson*, 378 F.3d at 545).

Remand is not necessary, however, if the ALJ's failure to provide good reasons is a "harmless *de minimis* procedural violation." *Blakley,* 581 F.3d at 409. Although we have yet to define "harmless error" in this context, we have identified three situations in which it might occur: (1) where "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) where "the Commissioner adopts the opinion of the treating source or

---

date. Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819, at *5844–45, 5869, 5880. Since Shields's claim was filed prior to March 27, 2017, SSR 96-2p applies to this case.

[10] "Although Social Security Rulings do not have the same force and effect as statutes or regulations, '[t]hey are binding on all components of the Social Security Administration' and 'represent . . . final opinions and orders [that create precedent] and statements of policy' upon which we rely in adjudicating cases." *Blakley*, 581 F.3d at 406 n.1 (first alteration in original) (quoting 20 C.F.R. § 402.35(b)).

makes findings consistent with the opinion," and (3) "where the Commissioner has met the goal of . . . the procedural safeguard of reasons." *Wilson*, 378 F.3d at 547. With respect to the last of these circumstances, "the procedural protections at the heart of the rule may be met when the 'supportability' of a doctor's opinion, or its consistency with other evidence in the record, is *indirectly* attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010). That said, "[a] procedural error is not made harmless simply because [the claimant] appears to have . . . little chance of success on the merits[,]" *Wilson*, 378 F.3d at 546 (quoting *Mazaleski v. Treusdell*, 562 F.2d 701, 719 n.41 (D.C. Cir. 1977)); and where the error makes meaningful review impossible, the violation of the good-reasons rule can never qualify as harmless error, *Blakley*, 581 F.3d at 409.

III

Reversal is required in this case because the ALJ failed to follow the treating-source regulation. It is undeniable that Lohman was one of Shields's treating physicians—records show that between May 2013 and January 2015, Lohman saw Shields on seven occasions and oversaw multiple cardiac catheterizations. *See, e.g.*, *Blakley*, 581 F.3d at 407 (finding a physician to be a treating source because he had "developed an extensive treatment relationship, spanning over one year"); *see also* Appellee Br. 20 (referring to Lohman as Shields's "treating cardiologist"). It is also uncontested that Lohman treated Shields during the period that she alleges being disabled. Lohman's opinion therefore should have been accorded controlling weight absent (1) sufficiently specific reasons for discounting it and (2) a precise explanation of how those reasons lead to that conclusion. *Rogers*, 486 F.3d at 243. Moreover, even were such a conclusion properly reached, Lohman's opinion was "still entitled to deference and [ought to

have] be[en] weighed using *all* of the factors provided in 20 [C.F.R. §§] 404.1527 and 416.927[,]" i.e., the *Wilson* factors.  Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4 (emphasis added).

The ALJ did not come close to satisfying this burden.  His dismissal of Lohman's functional assessment consisted of two sentences and is hardly a model of specificity:

> [t]he questionnaire asks the doctor to make assumptions, e.g. side effects of medications, which are beyond his experience with this patient and not strongly documented in the overall record.  Further, the extreme limitations in the questionnaire are not compatible with his [January 2015] statement of "She is doing well from a cardiac standpoint."

The first failing of this terse analysis is that it does not explain why Lohman's opinion was not accorded controlling weight, i.e., it does not identify evidence that would support a finding that Lohman's opinion was not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or was "inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  On the one hand, if the ALJ is asserting that Lohman's opinion is not well-supported, he points to no clinical or laboratory evidence that contradicts the doctor's analysis.  He simply rests his determination on the unfounded assumption that Lohman, a cardiologist, is unfamiliar with the side effects of cardiac medications.  On the other hand, if the ALJ is attacking the consistency of Lohman's assessment with "other substantial evidence," he unconvincingly cites a single, ambiguous comment in Shields's medical records.  One can be doing well, after all, even if one is severely limited in one's capabilities.  This is not to say that evidence does not exist to support the ALJ's conclusion, but only that he has not made his reasons for so deciding sufficiently clear.

The second shortcoming of the ALJ's opinion is that even if he provided an adequate basis for declining to give controlling weight to Lohman's questionnaire responses, he failed to "[b]alanc[e] the *Wilson* factors [as] is required to satisfy the second prong of the treating

physician rule." *Cole*, 661 F.3d at 938. In *Friend*, we held that an ALJ committed reversible error when he discounted a treating source's assessment of the claimant's standing and walking limitations on the grounds that (1) a reviewing source's assessment of those limitations was "more consistent with the objective clinical findings" and (2) "there [was] no basis for [the treating physician's] conclusion" about the claimant's ability to stand and walk. 375 F. App'x at 551–52. Such reasoning, we held, not only failed to satisfy the treating-source rule's first requirement—it "neither identifie[d] the 'objective clinical findings' at issue nor discusse[d] their inconsistency with [the treating physician's] opinion"—it also did not constitute an assessment of the opinion pursuant to the factors listed in 20 C.F.R. §§ 404.1527 and 404.927. *Ibid.* The court warned, "it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Id.* at 552.

In this case, the ALJ did not even go so far as to cite a contradictory medical source opinion when explaining why he gave Lohman's assessment no weight. Rather than subscribing to one of the alternative opinions offered, the ALJ accorded each of them "little weight" and adopted an RFC assessment that no medical source recommended. *See* Appellee Br. 23 ("[T]he ALJ's RFC charted a course between the more extreme limitations of Drs. Lohman and Ghotra . . . and the less restrictive opinions of Drs. Luking and Reed[.]"). Nor did the ALJ consider, as he was required to do, the length of Lohman's treatment relationship with Shields, the frequency of his examinations, the nature and extent of the treatment relationship, the consistency of the opinion with the record *as a whole*, or Lohman's specialization. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *see also Wilson*, 378 F.3d at 544. Instead, he dismissed Lohman's opinion solely

due to its perceived incompatibility with a single piece of evidence. *Friend* makes clear that such reasoning will not do.

Nor is this harmless error. As noted earlier, an ALJ's failure to follow agency procedures does not constitute harmless error when it prevents us from meaningfully reviewing his or her decision; and meaningful review is prevented when an ALJ's "reasoning is not 'sufficiently specific to make clear,' . . . that [he or she] recognized and evaluated the treating relationship[.]" *Blakley*, 581 F.3d at 409 (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5). In *Blakley*, we applied this rule to find that an ALJ committed reversible error when he discounted the opinions of two treating physicians, even though the ALJ explicitly referred to one of them as a treating physician and summarized the treatments that the claimant had received at the other's place of practice. *Id.* at 408–09.

Here, the ALJ committed both errors: not only did he fail to "explain in [his] decision whether []he weighed [Lohman] as an expert, a treater, or both," *see id.* at 408, he also provided no analysis of the treatment relationship. Instead, the ALJ simply referred to Lohman as a "provide[r of] many records," recounted Lohman's description of Shields as "doing well from a cardiac standpoint," noted that the doctor had given an "assessment of all [of Shields's] conditions, whether he treated them or not," and stated that Lohman had generated "clinic notes and objective findings." Given that the first three statements could be said of a consulting source, the entirety of the Commissioner's case rests on the ALJ's passing reference to "Dr. Lohman's clinic notes and objective findings." Such a fleeting comment is insufficient, however, to show that the ALJ recognized that Lohman had "an *ongoing* treatment relationship with [Shields] . . . [of] a *frequency consistent with accepted medical practice* for the type of

treatment and/or evaluation required for [the] medical condition(s)." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (emphasis added).

Furthermore, the ALJ's violation of the good-reasons requirement does not fall into any of the exceptions recognized in *Wilson*. *See* 378 F.3d at 547. For starters, it cannot be said that Lohman's assessment is "so patently deficient that the Commissioner could not possibly credit it." *See ibid.* The shortcomings of Lohman's opinion are numerous: his January 2015 clinic notes state that Shields's condition was "stable"; the questionnaire was designed by Shields's counsel and was intended to be filled out by her primary-care physician; it refers to maladies that Lohman did not treat; and Lohman's notations are largely restricted to checking 'yes' or 'no' in response to narrative-style questions. Nonetheless, the record does contain objective findings that are, at the very least, not inconsistent with Lohman's assessment. *See Blakley*, 581 F.3d at 409–10 (finding that treating-sources' opinions were not patently deficient where "numerous [tests] present[ed] objective findings that [were], at the very least, not inconsistent with . . . [the] opinions"). Cardiac catheterizations performed in 2013 and 2014 showed that Shields suffers from "moderate diffuse coronary disease," and Lohman's July 2014 clinical notes—which the ALJ accorded "significant weight"—state that she was on "maximal medical therapy" and had indications of congestive heart failure. Furthermore, Lohman's assessment of Shields's limitations was not a complete outlier amongst the medical opinions proffered; two years earlier, Ghotra had opined that Shields was more limited than the ALJ ultimately determined. Lohman's opinion, therefore, was not *patently* deficient as Shields's medical records include objective findings as well as opinions from other medical providers that do not contradict his assessment. *See Blakley*, 581 F.3d at 409; *see also Johnson-Hunt v. Comm'r of Soc. Sec.*, 500 F. App'x 411, 420 (6th Cir. 2012); *but see Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474–75 (6th

Cir. 2016) ("Even if the ALJ erred in failing to give good reasons for not abiding by the treating[-]physician rule, it was harmless error because the [medical source statement, which consisted of a check-box analysis without an accompanying explanation,] here is 'weak evidence at best' and meets our patently deficient standard." (citing *Friend*, 375 F. App'x at 551)).

The remaining two exceptions are equally inapplicable. Obviously, the ALJ did not make findings consistent with Lohman's opinion. Equally obvious, the ALJ's decision did not indirectly attack Lohman's medical assessment via its examination of the other medical opinions and of the claimant's physical problems. Merely listing alternative medical opinions—none of which were ultimately adopted—does not elucidate the ALJ's reasons for discounting Lohman's opinion. *See Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 466 (6th Cir. 2005). Likewise, given that the ALJ deemed Lohman to be a credible source of information deserving of "significant weight," the ALJ's discussion of the medical evidence provides no insight as to why he found Lohman's opinion devoid of value. For these reasons, we conclude that the ALJ failed to satisfy the good-reasons requirement.

IV

Because the ALJ did not follow the applicable procedural requirements in reaching his disability determination, we are unable to conduct a meaningful review of his decision. Accordingly, we **REVERSE** the district court's grant of the Commissioner's motion for summary judgment and **REMAND** with instructions to return the case to the Commissioner for further proceedings consistent with this opinion.